ROBBINS GELLER RUDMAN
 & DOWD LLP
SHAWN A. WILLIAMS (213113)
HADIYA K. DESHMUKH (328118)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
hdeshmukh@rgrdlaw.com
 – and –
ERIC I. NIEHAUS (239023)
BRIAN E. COCHRAN (286202)
PATTON L. JOHNSON (320631)
KENNETH P. DOLITSKY (345400)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
ericn@rgrdlaw.com
bcochran@rgrdlaw.com
pjohnson@rgrdlaw.com
kdolitsky@rgrdlaw.com

Attorneys for Plaintiffs

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| In re FTX INVESTORS SEQUOIA CAPITAL LITIGATION | ) ) ) | Case No. 3:23-cv-00655-JSC |
|---|---|---|
| | ) ) | CLASS ACTION |
| This Document Relates To: | ) ) | CONSOLIDATED COMPLAINT |
| ALL ACTIONS. | ) ) ) | |
| | ) | DEMAND FOR JURY TRIAL |

4885-5758-2693.v1

Patrick J. Rabbitte and Mark Girshovich (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, alleges the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts and upon an investigation conducted by and through counsel, which included, among other things, a review of Sequoia Capital Operations, LLC's ("Sequoia"), Thoma Bravo, LP's ("Thoma Bravo"), and Paradigm Operations LP's ("Paradigm") (collectively, "Defendants") financial and investor presentations, public statements, financial analysis, media reports and releases (including social media statements) by and about Defendants relating to FTX (defined herein) and filings in litigation involving Defendants and FTX.  Plaintiffs believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION

1.     This is a class action on behalf of all persons and entities other than Defendants that purchased, deposited, and/or transacted in fiat currency or digital assets in accounts with West Realm Shires Services Inc. d/b/a FTX US ("FTX US") or FTX Trading LTD d/b/a FTX ("FTX Trading") (collectively as a group, "FTX" or the "Company") between July 20, 2021 and November 11, 2022 (the "Class Period"), seeking to recover damages and other equitable and appropriate relief as a result of Defendants' violations of the California Unfair Competition Law, the California False Advertising Law, the California Corporations Code, and various common law causes of action as detailed herein.

2.     FTX Trading was a cryptocurrency exchange started in 2019 by Samuel Bankman-Fried ("Bankman-Fried"), who served as its Chief Executive Officer ("CEO") at all relevant times up until November 11, 2022.  FTX Trading's U.S. affiliate, FTX US, was founded in 2020.  FTX offered a range of trading products to cryptocurrency investors, including derivatives, options, volatility products, and leveraged tokens.  FTX also provided spot markets in more than 300 cryptocurrency trading pairs, including the native token FTT/USDT ("FTT Tokens"), thereby enabling FTX customers to trade with leverage and to short certain markets by borrowing from other FTX users.  Importantly, however, FTX's terms of service expressly stated that customer assets belonged solely to the customer and would not be transferred to FTX.

3.      FTX constituted one half of Bankman-Fried's cryptocurrency empire, the other half was a crypto-trading firm called Alameda Research ("Alameda"), which Bankman-Fried founded in 2017 in California.  Bankman-Fried served as CEO of Alameda until 2021, when he was succeeded by Caroline Ellison ("Ellison").  After stepping down as CEO of Alameda and at all relevant times thereafter, Bankman-Fried consistently maintained that FTX and Alameda were separate and distinct, but they were in fact not.

4.      From 2019 to 2022, FTX and Bankman-Fried undertook a major promotional marketing campaign.  The campaign, which included social media posts, interviews, sports partnerships, internet and television advertisements, and naming rights deals, rapidly increased FTX's valuation, which grew from $1.2 billion to $32 billion in only three years.

5.      FTX's campaign to build public and investor trust relied on significant financial support from Defendants.  A key component of the highly lucrative promotional marketing campaign included the air of legitimacy lent by Defendants Sequoia, Thoma Bravo, and Paradigm – U.S.-based venture capital and private equity firms – each of who claimed to have conducted significant due diligence of FTX's operations and vouched that the use of the FTX platforms was safe and secure for crypto investors.  These Defendants were part owners of FTX and had a significant financial interest in promoting the use of the FTX platforms.  Moreover, while FTX did not have a traditional Board of Directors, the Company did have an Advisory Board that included representatives from each Defendant.

6.      On July 20, 2021, Defendants partook in a media campaign, issuing a press release and making postings on social media, to advertise the fact that they had invested hundreds of millions of dollars in FTX.  By the time FTX declared bankruptcy on November 11, 2022, Sequoia had invested over $200 million, Thoma Bravo had invested more than $100 million, and Paradigm had invested more than $250 million in FTX.  All told, Defendants invested well over half a billion dollars in the fraudulent FTX scheme.  As a result of Defendants' significant investments in FTX, each was incentivized to leverage their professional reputations and media outreach capabilities to portray FTX as a trustworthy and legitimate crypto exchange, as reflected by each Defendant's participation in promotional efforts from the very beginning of their investments in FTX.

Defendants intended to drive users to the exchange in order to increase the valuation of FTX, with the goal of increasing the return on Defendants' investments.

7.     Defendants knew that their investments in FTX would be used to promote the platforms as credible and trustworthy.  Defendants bolstered these marketing campaigns with their own promotional materials, which sought to gain public trust and distinguish FTX as the most trusted brand in the crypto industry.  Throughout the Class Period and as detailed herein, Defendants made numerous deceptive and misleading statements about FTX's business, finances, operations, and prospects for the purpose of inducing customers to invest, trade, and/or deposit assets with FTX. For example, Defendants portrayed FTX as a fast-growing tech startup that had revolutionized the crypto space through innovation, reliability, and a focus on the greater good.  Defendants also claimed that FTX's transformative business could be, and in fact was already, being applied to a host of interconnected platforms that would forever change cryptocurrency markets.

8.     For example, in a now-deleted self-published piece on its website, Sequoia claimed that FTX had distinguished itself by its trustworthiness and was backed by "credible sources" (most notably Sequoia), stating in pertinent part as follows:[1]

> Alameda was not immune to the exchange-level shenanigans that gave crypto as a whole its sleazy reputation. ***But FTX had an ambition to change that.  It was built to be the exchange traders could count on***.  SBF needed to get the word out.  ***He wanted FTX to be known as the respectable face of crypto***.  This required ad campaigns, sponsorship deals, a charitable wing – and a war chest to pay for it all.
>
> FTX did need the money, after all.  ***And it needed that money from credible sources so it could continue to distinguish itself from the bottom-feeders who came to crypto to fleece the suckers***.[2]

(Emphasis added and in original.)

9.     Like Sequoia, Thoma Bravo attempted to lure users to the FTX exchange in order to raise FTX's valuation and make its stake in FTX more valuable.  On November 27, 2021, in response to a tweet warning crypto traders to "[o]nly trade [bitcoin] on a legitimate exchange you trust," Orlando Bravo, Thoma Bravo's founder and managing partner, portrayed FTX as the most

---

[1]   Emphasis added here and throughout unless otherwise noted.

[2] The referenced article has since been deleted from Sequoia's website.

1  trustworthy exchange available and urged his Twitter followers to "[o]nly trade [bitcoin] with

2  [FTX]."

3       10.    Thoma Bravo continued its promotional activities throughout 2022, repeatedly

4  praising Bankman-Fried and FTX.  On January 4, 2022, Mr. Bravo was quoted in a *MarketWatch*

5  article, stating that Bankman-Fried "'combines being visionary with being a phenomenal

6  operator . . . .  That is rare.'"

7       11.    Similarly, following its initial investment in FTX, Paradigm touted the purported

8  promise of the FTX exchange and its "vison[ary]" founder, stating in pertinent part as follows:

9           Sam Bankman-Fried is one of those special founders whose vision is both
10  stunningly ambitious and uniquely adapted to the future of crypto.  ***The team's
   execution speaks for itself, with FTX growing to become a top global exchange in
11  two years***.  There's a bright future ahead for Sam and FTX, and Paradigm is excited
   to be a part of it.

12       12.    Paradigm continued to tout FTX's global platform throughout 2022, for example, on

13  February 23, 2022 by praising FTX's purportedly "'great . . . regulatory engagement,'" stating in

14  pertinent part as follows:

15           Paradigm has been fortunate to be an investor in FTX's global business, and we are
   thrilled to invest in FTX.US.  ***The team is world class and their focus on great
16  products and regulatory engagement will help ensure access to crypto for millions
   of Americans*** . . . .

17
        13.    In October 2021, Sequoia publicly referred to Bankman-Fried as "a special founder
18
   who is ambitious and daring enough to build the future of crypto by establishing FTX as the global
19
   exchange with the best overall product offering and leveraging the world's crypto rails to build the
20
   future of finance."  In the same remarks, Sequoia stated that it was "thrilled to partner with FTX on
21
   their next phase of growth."
22
        14.    Alfred Lin, the Sequoia partner who led the firm's investments into FTX, stated in a
23
   July 20, 2021 press release published by FTX that the Company was the "high-quality, global crypto
24
   exchange the world needs," and describing Blankman-Fried as the "perfect founder", stating in
25
   pertinent part as follows:
26
            ***FTX is the high-quality, global crypto exchange the world needs***, and it has
27  the potential to become the leading financial exchange for all types of assets.  ***Sam is
   the perfect founder to build this business, and the team's execution is
28  extraordinary***.  We are honored to be their partners.

15.     But each Defendant knew or was reckless in not knowing that Bankman-Fried's empire was a sham.  Each Defendant had access to information from their own due diligence process that was not publicly known, and indeed, Defendants touted the due diligence process for their respective funds that invested in FTX.  For example, Sequoia appeared on FTX's Podcast saying that they invested in FTX because they "did their homework way in advance."  Thoma Bravo states that its funds not only do initial "formal due diligence" but also "Monitor Investments and Work Collaboratively with Management."   Paradigm also claims that it conducted "reasonable and appropriate" due diligence for its funds, specifically highlighting the risks of "Crypto Asset Exchanges."

16.     In addition, Sequoia and Paradigm received $135 million in investments into funds they managed from entities owned by Bankman-Fried and Alameda, knowing or reckless in not knowing that by earning investment fees from Bankman-Fried and Alameda's investments Sequoia and Paradigm were directly benefiting from the improper use of customer assets.  As discussed below, as private fund managers, these Defendants were required to investigate who the beneficial owner of the entities making the investments were, their financial information and the source of funds.  Any reasonable due diligence or investigation into these entities would have revealed that Bankman-Fried, FTX and Alameda were comingling assets and using customer deposits to fund their own investments.

17.     On January 18, 2023, Christy Goldsmith Romero, Commissioner of the Commodities Futures Trading Commission ("CFTC"), delivered a speech at The Wharton School and the University of Pennsylvania Carey Law School, entitled "Crypto's Crisis of Trust:  Lessons Learned from FTX's Collapse."  Ms. Goldsmith Romero described the way in which Sequoia had knowingly offered its legitimacy to FTX, luring in unsuspecting customers where they were victimized by "one of the most significant breaches of trust in financial history," stating in pertinent part as follows:

> *FTX appears to have used Sequoia as a credibility and trust enhancer, and it used Sequoia's money to embark on a campaign to gain public trust and distinguish itself as the most trusted brand in crypto*.
>
> *It appears that Sequoia at least knew its money would be used in this fashion*.  However, there are serious questions and allegations about whether this public-relations "war chest" was funded not only by venture capital money but also

customer property.  If those allegations prove to be true, this could be one of the most significant breaches of trust in financial history.

*The multi-dimensional public relations campaign was meant to build the public's trust in FTX*.  And I have not discussed all elements of that campaign.  There were rumored efforts to influence charities and policy advocacy groups.  There were efforts relating to FTX's extensive legal and political spending; and even an alleged investment in a crypto news site.  *All of this appears to be part of a branding campaign designed to make FTX appear trustworthy*.

FTX's violation of the trust it built through this campaign deepened the trust deficit for an unregulated crypto industry already badly damaged by the collapse of TerraUSD, Three Arrows Capital, Celsius and Voyager.  The crypto industry is left with a crisis of trust.

18.    FTX's success story began to unravel on November 2, 2022 when *CoinDesk* published an article entitled "Divisions in Sam Bankman-Fried's Crypto Empire Blur on His Trading Titan Alameda's Balance Sheet."  The article questioned the financial health of both Alameda and FTX and asserted that Alameda's balance sheet was made up primarily of FTX's native FTT Tokens.  According to the article, this indicated that Alameda "rest[ed] on a foundation largely made up of a coin that a sister company invented, not an independent asset like a fiat currency or another crypto."

19.    Shortly after the *CoinDesk* article was published, FTX experienced significant customer withdrawals, resulting in a liquidity crisis.  Ultimately, Bankman-Fried elected to freeze all withdrawals of customer assets.

20.    On November 8, 2022, rival cryptocurrency exchange Binance announced that it had reached a non-binding deal to acquire FTX Trading.  However, just one day later, Binance reversed its decision, stating that its review of FTX Trading's finances had uncovered liquidity issues that were "beyond [Binance's] control or ability to help."

21.    On November 10, 2022, Bankman-Fried took to Twitter and issued a series of 22 tweets apologizing to customers and attempting to offer an explanation for the crash.

22.    Shortly after the foregoing disclosures, on November 11, 2022, Bankman-Fried resigned as CEO of FTX, and FTX, Alameda and other Bankman-Fried entities filed for bankruptcy. In a Delaware bankruptcy court filing, FTX's new CEO John J. Ray III, who previously served as chairman of the company tasked with recovering creditor funds from Enron, stated that: "*[n]ever in*

1   *my career have I seen such a complete failure of corporate controls and such a complete absence*

2   *of trustworthy financial information as occurred here. . . .   [T]his situation is unprecedented*."

3          23.     On November 12, 2022, *The Wall Street Journal* reported that Bankman-Fried,

4   Ellison, and other FTX executives knew that FTX had used customer assets to cover Alameda's

5   trading losses and repay its outstanding debts.

6          24.     On December 13, 2022, Mr. Ray testified before the House Financial Services

7   Committee stating: "'***This is really old-fashioned embezzlement . . . .   This is just taking money***

8   ***from customers and using it for your own purpose.   Not sophisticated at all***.'"   According to Mr.

9   Ray, the dysfunction at FTX was longstanding, with no independent board, no coherent

10  recordkeeping, and "'absolutely no internal controls, whatsoever.'"   Defendants represented

11  sophisticated investors that had invested hundreds of millions of dollars in FTX, and Defendants

12  knew or were reckless in not knowing these glaring deficiencies through their purported due

13  diligence activities.   Yet, instead of telling the truth, defendants chose to misrepresent FTX's

14  operations in order to induce customers to use the FTX platforms.

15         25.     As alleged herein, and as continues to be revealed in the parade of media exposés and

16  government and private actions being pursued against implicated parties, FTX was operated

17  essentially as a Ponzi scheme, with customer funds entrusted to FTX being used for self-dealing and

18  to cover over prior investment losses.   In the end, billions of dollars' worth of customer assets

19  became a casualty of the greed of Bankman-Fried and of his co-conspirators, such as the Defendants,

20  who issued materially false and misleading statements about the credibility, safety, and compliance

21  of the FTX platforms and otherwise aided and abetted the misconduct that led to the collapse of

22  FTX, as detailed herein.

23         26.     Also on December 13, 2022, CFTC Chair Rostin Benham lambasted the fact that

24  "FTX customer assets were routinely accepted and held by Alameda and commingled with

25  Alameda's funds," after the CFTC filed its own complaint related to the collapse of FTX, stating in

26  pertinent part as follows:

27         *FTX held itself out as 'the safest and easiest way to buy and sell crypto' and*
           *represented that customers' assets, including both fiat and digital assets including*
28         *bitcoin and ether, were held in 'custody' by FTX and segregated from FTX's own*

*assets.  To the contrary, FTX customer assets were routinely accepted and held by Alameda and commingled with Alameda's funds*.  Alameda, Bankman-Fried, and others also appropriated customer funds for their own operations and activities, including luxury real estate purchases, political contributions, and high-risk, illiquid digital asset industry investments.  The complaint further alleges that, at Bankman-Fried's direction, FTX employees created features in the FTX code that favored Alameda and allowed it to execute transactions even when it did not have sufficient funds available, including an 'allow negative flag' and effectively limitless line of credit that allowed Alameda to withdraw billions of dollars in customer assets from FTX.  These features were not disclosed to the public.

27.     That same day, Securities and Exchange Commission ("SEC") Chair Gary Gensler called FTX "'a house of cards'" built "'on a foundation of deception'" following the filing of a related SEC complaint, stating in pertinent part as follows:

'*We allege that Sam Bankman-Fried built a house of cards on a foundation of deception while telling investors that it was one of the safest buildings in crypto*. . . .  The alleged fraud committed by Mr. Bankman-Fried is a clarion call to crypto platforms that they need to come into compliance with our laws.  Compliance protects both those who invest on and those who invest in crypto platforms with time-tested safeguards, such as properly protecting customer funds and separating conflicting lines of business.'

28.     Also on December 13, 2022, SEC's Director of Enforcement Gurbir S. Grewal decried how FTX's true operations were diametrically opposed to the marketing pitches made to FTX customers  (which mirrored the statements made by Defendants), stating in pertinent part as follows:

'*FTX operated behind a veneer of legitimacy Mr. Bankman-Fried created by, among other things, touting its best- in-class controls, including a proprietary "risk engine," and FTX's adherence to specific investor-protection principles and detailed terms of service.  But as we allege in our complaint, that veneer wasn't just thin, it was fraudulent* . . . .'

29.     On April 9, 2023, Mr. Ray filed with the United States Bankruptcy Court for the District of Delaware a report detailing the "pervasive lack of records and other evidence at the FTX Group of where or how fiat currency and digital assets could be found or accessed, and extensive commingling of assets."   The report states how FTX and Alameda had, among other things, effectively non-existent board oversight, no fundamental financial and accounting controls, and did not even have an accounting system capable of handling the trades of FTX and Alameda.  The report details significant discrepancies in records, substantial accounts and positions simply left untracked and billions of dollars in missing funds.  The report also highlighted multiple examples of FTX and

Alameda's complete inability to safeguard and manage crypto currencies, much less act as a world class crypto exchange as Defendants' promoted.

30.    As a result of Defendants' active participation in the wrongful acts described herein, Plaintiffs and other Class members (defined herein) have been unable to access or withdraw billions of dollars' worth of deposited funds and/or assets in FTX and have suffered significant losses and damages.

## JURISDICTION AND VENUE

31.    The claims asserted herein arise under and pursuant to the California Unfair Competition Law, the California False Advertising Law, the California Corporations Code, as well various common law causes of action.

32.    This Court has subject matter jurisdiction over this matter under 28 U.S.C. §1332(d)(2), as this is a class action where at least one of the members of the Class is a citizen of a state different from at least one of the Defendants and also where at least one of the members of the Class is a foreign citizen, and the matter in controversy exceeds the sum or value of $5,000,000.

33.    This Court has personal jurisdiction over Defendants because each of the Defendants maintain primary offices in this District, conduct substantial business in this District, and otherwise intentionally availed themselves of the State of California's consumer market through the promotion, marketing, and sale of products and services offered by FTX in and from this District.  Accordingly, Defendants committed tortious acts within the State of California and within this District.  Defendants' purposeful availment renders the exercise of jurisdiction by this Court over Defendants permissible under traditional notions of fair play and substantial justice.

34.    Venue is proper in this judicial district under 28 U.S.C. §1391(b), because: (i) one or more Defendants reside in this District; and (ii) a substantial part of the events or omissions giving rise to the claims occurred in this District.  Bankman-Fried launched his crypto empire from this District, including by founding Alameda in this District.  Sequoia maintained its headquarters in Menlo Park, California at all relevant times.  Paradigm maintained its headquarters in San Francisco, California at all relevant times.  Thoma Bravo maintained primary offices in San Francisco, California at all relevant times.  Defendants prepared many of the deceptive statements complained

1    of herein in substantial part in California, the statements relate in substantial part to Defendants'

2    California operations, the statements were used to induce the investment and/or deposit of funds

3    (including cryptocurrency) into FTX by California residents, and the statements were disseminated

4    in California and to members of the Class who reside in California.

5          35.    In connection with the acts alleged in this complaint, Defendants, directly or

6    indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to,

7    the mails, and interstate telephone and/or wire communications.

8                                      **THE PARTIES**

9          36.    During the Class Period, plaintiff Patrick J. Rabbitte purchased, deposited, and

10   transacted assets with FTX and has been damaged thereby, including because he has been unable to

11   access or withdraw significant assets held in his FTX accounts.

12         37.    During the Class Period, plaintiff Mark Girshovich purchased, deposited, and

13   transacted assets with FTX and has been damaged thereby, including because he has been unable to

14   access or withdraw significant assets held in his FTX accounts.

15         38.    Defendant Sequoia is a venture capital firm.  The firm is headquartered in Menlo

16   Park, California, and specializes in seed stage, early stage, and growth stage investments in private

17   companies across technology sectors.  As of 2022, Sequoia's total assets under management were

18   approximately $85 billion.  Sequoia was an early investor in FTX and one of the primary promoters

19   of FTX to the financial community and cryptocurrency investors around the world.

20         39.    Defendant Thoma Bravo is a private equity firm.  The firm is headquartered in

21   Chicago, with primary offices in Miami and San Francisco, and describes itself as one of the largest

22   software investors in the world with over $120 billion in assets under management as of September

23   30, 2022.  Thoma Bravo was an early investor in FTX and one of the primary promoters of FTX to

24   the financial community and cryptocurrency investors around the world.

25         40.    Defendant Paradigm is a venture capital firm.  The firm is headquartered in San

26   Francisco, California, and invests in the cryptocurrency, financial services, information technology,

27   media, telecommunication, SaaS, and web3 sectors.  Paradigm was an early investor in FTX and one

28

1   of the primary promoters of FTX to the financial community and cryptocurrency investors around
2   the world.

3       41.    Each of the Defendants is liable for making deceptive and/or misleading statements,
4   willfully participating in acts that damaged Class members in violation of the law, and/or aiding and
5   abetting violations of law as described herein.  In committing the wrongful acts alleged herein, each
6   of the Defendants willfully participated in acts and transactions and/or aided and abetted such
7   unlawful acts and transactions, which promoted the purported trustworthiness, favorable risk profile,
8   and financial stability of FTX, thereby deceiving the investing public.

9   **FACTUAL ALLEGATIONS**

10  **The Rise of FTX**

11      42.    In 2017, Bankman-Fried founded Alameda in Berkeley, California.  The crypto-
12  trading firm first rose to prominence by arbitraging the price of bitcoin between different markets
13  before venturing into other types of trades and investments in cryptocurrency projects.

14      43.    In 2019, Bankman-Fried created FTX, an abbreviation of "futures exchange."  FTX
15  offered investors a range of trading products such as derivatives, options, volatility products, and
16  leveraged tokens.  FTX also provided spot markets in more than 300 cryptocurrency trading pairs,
17  including its native token FTT Tokens.  One of the attractive features of FTX's digital assets came
18  from its terms of service, which provided that customer assets belonged solely to the customer and
19  would not be transferred or otherwise used in FTX's trading.  Bankman-Fried consistently
20  maintained that FTX and Alameda were separate and distinct.

21      44.    Indeed, FTX Trading's terms of service stated, in relevant part, as follows:

22  8.2.6.  All Digital Assets are held in your Account on the following basis:

23      (a)    ***Title to your Digital Assets shall at all times remain with you and
shall not transfer to FTX Trading***.  As the owner of Digital Assets in your Account,
24  you shall bear all risk of loss of such Digital Assets.  FTX Trading shall have no
liability for fluctuations in the fiat currency value of Digital Assets held in your
25  Account.

26      (b)    ***None of the Digital Assets in your Account are the property of, or
shall or may be loaned to, FTX Trading***; FTX Trading does not represent or treat
27  Digital Assets in User's Accounts as belonging to FTX Trading.

28

(c)   ***You control the Digital Assets held in your Account***.  At any time, subject to outages, downtime, and other applicable policies (including the Terms), ***you may withdraw your Digital Assets*** by sending them to a different blockchain address controlled by you or a third party.

45.     The FTX US terms of service contained similarly reassuring language, stating in relevant part as follows:

As part of your FTX.US account, FTX.US provides qualifying users access to accounts for you to store, track, transfer, and manage your balances of cryptocurrency and/or dollars or other supported currency.  ***All cryptocurrency or dollars (or other supported currencies) that are held in your account are held by FTX.US for your benefit. . . .   Title to cryptocurrency represented in your FTX.US Account shall at all times remain with you and shall not transfer to FTX.US. . . . FTX.US does not represent or treat assets in your FTX.US Account as belonging to FTX.US***.

46.     In addition, FTX.US's website contained a document entitled "FTX's Key Principles for Ensuring Investor Protections on Digital-Asset Platforms," which stated that FTX "segregates customer assets from its own assets across our platforms."  The document also represented that FTX maintained "liquid assets for customer withdrawals . . . [to] ensure a customer without losses can redeem its assets from the platform on demand."

47.     Through, *inter alia*, media reports, bankruptcy proceedings, and in detailed allegations from actions filed by regulators and prosecutors, the statements alleged above about the manner of holding, and segregation of, customer assets at FTX have been revealed to be materially false and misleading.  In truth, Bankman-Fried and Alameda misappropriated customer assets for their own personal use, proprietary trading purposes, and to cover investment losses, among other misuses.

48.     During the Class Period, FTX experienced a meteoric rise in success due in no small part to an aggressive promotional campaign bankrolled and supported by Defendants.  Throughout this period, Bankman-Fried established himself at the forefront of the cryptocurrency space and soon became known and referred to worldwide under the abbreviation "SBF."  As Bankman-Fried achieved his celebrity status, he was hailed by some market analysts as the "savior of crypto." Bankman-Fried burnished this reputation through myriad Twitter posts, television and podcast interviews, and political donations.  As part of his attempt to appear beyond reproach and selfless,

Bankman-Fried described himself as promoting a charitable movement called "Effective Altruism" and promised to donate the wealth he was accruing to a variety of charities.

49. During the same period, FTX Trading became one of the largest crypto-trading companies in the world, with nearly $15 billion in assets being traded on its platforms daily. FTX's marketing efforts involved partnering with popular names in sports and entertainment. Specifically, FTX secured several celebrity "brand ambassadors" and released a series of internet and television advertisements to promote these partnerships. Further, FTX entered into various sponsorships and naming rights deals with high-profile sports programs such as UC Berkeley Athletics and the Miami Heat.

50. A key component of these promotional efforts was the legitimacy lent by Defendants as well-known and respected venture capital and private equity firms. Defendants not only invested in FTX knowing that these funds would be spent on the false and misleading promotional activities described above, they often directly touted the purported safety, trustworthiness, and favorable risk profile of the FTX platforms. As intended, these promotional efforts resulted in a rapid increase in FTX's valuation. By July 2021, FTX Trading had attained a valuation of $18 billion after securing funding from major financial players in the crypto space such as multinational conglomerate Binance and each of the Defendants, among others. By October 2021, after securing another series of investments, FTX Trading had reached a valuation of $25 billion, representing a sizable and speedy return on Defendants' initial investments. By January 2022, FTX US attained a valuation of $8 billion after securing its own institutional funding. Combined, FTX had attained a valuation exceeding $32 billion in only three years – achieved predominantly through Defendants' relentless efforts to promote the FTX exchange as reliable and trustworthy so as to increase the returns on their respective investments.

51. Venture capital and private equity firms routinely conduct due diligence before making investments into companies. As one global law firm, with a National Tier 1 ranking by U.S. News in venture capital law, states:

> Venture capital investors typically complete a due diligence review process before finalizing an investment. Investors perform due diligence to confirm information previously provided by the company's management and assess the strengths,

weaknesses and risks of the company's business and plans.  The process, which involves reviewing and gathering information and documents about the company and investment opportunity, includes both *business diligence* and *legal diligence*.

52.     Another National Tier 1 law firm has published a sample due diligence request list of "what VCs will look for before they'll close your financing."  In addition to formation and structural type documents, the list includes requiring documents concerning the operations of the target company, such as information concerning directors, officers, employees and transactions, loans or other arrangements with them.  "Debt Financing" documents are also requested, such as all "debt instruments and credit agreements" and "[a]ny guarantees of third party obligations", and the "[m]ost recent audited financial statements" or "[a]ny other agreements material to the business of the Company, or outside the ordinary course of business."

53.     Defendants claimed to have done due diligence on the FTX entities, but even a cursory due diligence review would have raised serious doubts about the business practices and legitimacy of FTX and Alameda.  For example, a November 15, 2022 article published by Insider, describes how Bankman-Fried pitched investing in FTX to CEO and founder of venture capital company Social Capital, Chamath Palihapitiya, during the same investment round that each of the Defendants invested.  "After a Zoom meeting with Bankman-Fried, Palihapitiya said [Bankman-Fried] didn't 'make much sense,' so his team at Social Capital worked on a two-page deck of recommendations for next steps for FTX if the investment talks were to proceed."  Social Capital made three recommendations to FTX: (1) form a board; (2) create a dual-class stock; and (3) provide investors with "'some reps and warranties around affiliated transactions and related party transactions.'"  Palihapitiya explained that after making these recommendations "'[t]he person that worked there called us back and literally, I'm not kidding you, said, 'go fuck yourself.'"

54.     As more fully set forth below, despite glaring red flags, and fraud that a proper due diligence would have revealed, Defendants each invested in and promoted FTX.  Before deploying millions of dollars to legitimatize Bankman-Fried's empire, Defendants had the opportunity to, and indeed claimed they did, conduct due diligence that would have shown that customer assets were being comingled, massive "loans" were being given across FTX and Alameda, a complete lack of internal controls existed and that outright fraud was occurring.  Instead, using their stature and

reputation, they promoted FTX and Bankman-Fried to unsuspecting investors who went on to transact and deposit fiat currency or digital assets in accounts with FTX thinking that if Defendants are endorsing FTX it must be safe.  But Defendants actually or constructively knew, or were reckless in not knowing, that Bankman-Fried's empire was a complete and utter sham.

**History of Sequoia**

55.     Sequoia is a venture capital firm headquartered in the heart of Silicon Valley. Sequoia was founded by Don Valentine in 1972 and early on made profitable investments in then-nascent computer technology companies like Atari and Apple.  The company has "long been seen as the gold standard in the venture capital industry for its high investment bar."

56.     Sequoia earns lucrative investment management fees by pooling capital from its investors, which it then generally invests in pre-IPO companies with a focus on the technology sector.  Sequoia captures the appreciation of its investments between the time of the funding rounds and the time that the company goes public via an IPO.  Because Sequoia invests early in the life cycle of a company, there is tremendous potential to return many times its initial investment – potential that most average investors do not have.

57.     Investing decisions are made by Sequoia's general partners (called simply "partners" by Sequoia), while limited partners only have a stake in the profits of the Sequoia-managed funds they invest in.  Sequoia claims that when it comes to the companies they invest in, they are "***actively engaged partners who roll up our sleeves and dedicate decades of collective company-building experience to help founders achieve their potential***."

58.     Sequoia is one of the largest venture capital firms in the world with over $85 billion in assets under management in 2022.  Sequoia is highly respected among investors with several of its partners being named to *Forbes*' 2022 "The Midas List," which is a list of "The World's Best Venture Capital Investors."[3]  Alfred Lin, the Sequoia partner who led the firm's investments into

---

[3]     Sequoia and Mr. Lin also appeared on Valuer's 2021 list of "100 Top Venture Capitalists in the USA."  https://www.valuer.ai/blog/100-top-venture-capitalists-in-the-usa.  In 2017, Mr. Lin was fourth on *The New York Times*' "Top 20 Venture Capitalists Worldwide" list.  https://www.nytimes.com/interactive/2017/03/27/technology/Top-20-Venture-Capitalists.html.  In 2021, *dealroom.co* named Sequoia the second-most prominent venture capital firm in the world.  https://dealroom.co/blog/vc-investor-prominence-rank-2021.

1    FTX, came in at 7th out of the 100 venture capitalists named to The Midas List.  In 2021, he was

2    first.

3        59.    Mr. Lin has an impressive management track record even outside Sequoia, having

4    been COO and Chief Financial Officer ("CFO") of online footwear retailer Zappos.  Mr. Lin helped

5    lead Zappos to Amazon.com's $1.2 billion acquisition of the shoe retailer in 2009.  After Zappos,

6    Mr. Lin joined the Sequoia team as a partner in 2010.  Mr. Lin has been involved in several highly

7    profitable investments for Sequoia, such as its investments in Airbnb, Uber, DoorDash, and

8    Instacart, among others.  In fact, Mr. Lin is so well respected in the industry that *Forbes* published a

9    piece naming him "The World's Best Venture Capitalist."  The *Forbes* article detailed how Sequoia

10   banked more than $21 billion in a two-day period – thanks to the successful IPOs of Sequoia's

11   investments in DoorDash and Airbnb led by Mr. Lin.  Another *Forbes* article entitled "The 30 Most

12   Influential People in Tech" summarized his accomplishments as "[e]verything he touches turns to

13   gold."  Put simply, Mr. Lin's success at Sequoia is well known to the investing public, and, when

14   Mr. Lin speaks, investors tend to listen to what he has to say.

15       60.    Mr. Lin's partner and co-lead on Sequoia's FTX investments was Michelle Bailhe.

16   Following Ms. Bailhe's graduation from Brown, she spent time at McKinsey & Co., Google, and

17   private equity firm Hellman & Friedman before being brought on as one of the youngest partners in

18   Sequoia's history.  Ms. Bailhe is heavily involved in Sequoia's crypto and blockchain-related

19   investments and she often appears on television, including *CNBC* and *Bloomberg*, as well as various

20   podcasts to discuss the industry.  Ms. Bailhe heavily promoted Sequoia's FTX investments, hosting

21   interviews with Bankman-Fried, facilitating the publication of articles touting FTX, and making

22   several television and podcast appearances to promote the Company.  For Ms. Bailhe, Sequoia's

23   investment in FTX provided an opportunity to mark her name right next to Mr. Lin's, as the

24   visionary who helped bring FTX to market.

25   **Sequoia Promotes FTX and Bankman-Fried**

26       61.    On July 20, 2021, Sequoia participated for the first time in a funding round for FTX.

27   This Series B funding round raised $900 million for FTX Trading, valuing the two-year-old

28   Company at $18 billion.  At the time, the funding round was the largest private crypto funding deal

ever.  Bankman-Fried explained after the round that "[t]he primary goal of the raise was to [find] strategic allies who can help FTX grow its brand."  Bankman-Fried further touted the fundraising round on Twitter tagging Sequoia, Paradigm and Thoma Bravo among others:



**SBF** ✔
@SBF_FTX

2) @FTX_Official has closed ~$900m at a valuation of ~$18B.

@sequoia, @paradigm, @RibbitCapital, @thomabravo, @insightpartners, @SoftBank_Group, @ThirdPointLLC, @lightspeedvp, @bondcap, @coinbase, @sinoglobalcap, @multicoincap, @ptj_official, @vaneck_us, @circlepay, and more

10:06 AM · Jul 20, 2021

62.    Mr. Lin, who also served on FTX's Advisory Board, lent his name to a July 20, 2021 FTX promotional press release, describing the funding round as the "Largest Raise in Crypto Exchange History."  The release, which also featured Defendants Paradigm and Thoma Bravo, contained the following quote from Mr. Lin:

> ***FTX is the high-quality, global crypto exchange the world needs***, and it has the potential to become the leading financial exchange for all types of assets.  ***Sam is the perfect founder to build this business, and the team's execution is extraordinary***.  We are honored to be their partners.

63.    At the time of FTX Trading's Series B funding round, FTX Trading had over one million users and was averaging over $10 billion of daily trading volume.  Following the close of the funding round, crypto traders and investors heeded Mr. Lin's advice and flocked to FTX as a safe haven for what they believed to be high-quality, safe crypto trading.

64.    On October 21, 2021, FTX conducted another fundraising round.  Because of the amount of capital raised, over $420 million, this round would become known as the "Meme Round." Sequoia participated again in this round, which valued FTX Trading at just shy of $25 billion – meaning Sequoia's initial investment in the Series B round had appreciated by almost 40% in just three-months.  For context, the S&P 500 Index was up less than 7% during that same period. Sequoia's promotional efforts had worked.  In just the three months since Sequoia's initial

1  investment, the FTX Trading user base increased 48% and its average daily trade volume increased

2  to more than $14 billion.

3       65.    Recognizing the success of Sequoia's investment, Mr. Lin and Ms. Bailhe launched a

4  media blitz to further cement FTX's apparent legitimacy.  For example, on October 21, 2021, Mr.

5  Lin was again quoted by FTX in a Company press release highlighting the close of the most-recent

6  funding round.  In the release, Mr. Lin called Bankman-Fried "a special founder who is ambitious

7  and daring enough to build the future of crypto by establishing FTX as the global exchange with the

8  best overall product offering and leveraging the world's crypto rails to build the future of finance."

9  He concluded that Sequoia was "thrilled to partner with FTX on their next phase of growth."

10       66.    After the Meme Round, Sequoia had committed more than $200 million in capital to

11  FTX and it sought to ensure that this investment continued to appreciate.  In total, Sequoia invested

12  in both FTX US and FTX Trading's common and preferred shares through at least two funds: SCGE

13  Fund, L.P., and Sequoia Capital Global Growth Fund III - Endurance Partners, L.P., for itself and as

14  nominee.  Sequoia acquired at least 35,046,340 shares of common stock and 10,611,241 shares of

15  preferred stock.

16       67.    On November 20, 2021, Ms. Bailhe appeared on FTX's own "The FTX Podcast."

17  She had the following exchange with FTX employee and podcast host, Tristan Yver, in which she

18  represented that Sequoia's confidence in FTX was based on its substantial due diligence:

19         [Yver:]  Did you guys go into FTX because Sam's narrative or because the
       story that FTX told?

20

21         [Bailhe:]  It's so funny because I actually shared before we ever met Sam in
       an official Sequoia meeting, I had sent this email to all the people on our side that

22         were going to join about like guys like "Don't ask silly questions in the meeting.
       This is an amazing company.  Please bring your 'A' game. . . .  "Did you guys just

23         invest because Sam is so charismatic?"  ***And Alfred [Lin] and I were like "No, we
       do our homework."  We did our homework way in advance.  We knew FTX was
       this amazing company and we also knew Sam was an amazing founder***.  In the

24         meeting, I think what we loved about Sam is yes, he is an amazing storyteller which I
       think is important to create truly legendary companies.

25       68.    During the same podcast, Ms. Bailhe explained that Sequoia takes an active role in

26  the operations of companies that it invests in, like FTX, stating in pertinent part as follows:

27

28

[Yver:]  So you guys have a lot of communication with these founders that you're backing then?  It's not an off-hand process in which you guys invest and then let them go off to the races?

[Bailhe:]  No, no.  **There is a big active conversation throughout.  I think we take it probably more seriously than any other firm**.  We've been debated actually about whether founders would appreciate that or not.  The founders we work closely with seem to appreciate it a lot and **we try to be really careful**.  Because we're not just passive money.  We want to be really business partners.  Not where it's overbearing and we're in your hair but we are partners with you for a decade or however long you want, so it's not okay to back a direct competitor that is going after you if you're not okay with that.

69.   On December 17, 2021, Ms. Bailhe authored an article entitled "Ask Not Wen Moon – Ask Why Moon" that was published on Sequoia's website.  In the article, Bailhe put forth her bullish case for crypto going forward and promoted Sequoia's close relationship with FTX and Bankman-Fried, stating in pertinent part as follows:

Like all other waves of technology, **Sequoia's mission is to partner with the most daring founders in crypto and help them build something legendary.  We're proud partners of Sam at FTX**, Jack at Square now Block, Michael at Fireblocks, Uri at Starkware, Elena at Iron Fish, Nader at DeSo, Vlad at Robinhood, and a dozen other seed-stage companies still in stealth.  Because we believe crypto will impact every industry, crypto is a firm-wide focus that includes myself (FTX, Fireblocks), Shaun Maguire (DeSo, ParallelFi, Iron Fish, Faraway, Strips, and more seeds in stealth), Alfred Lin (FTX), Mike Vernal (Starkware), Ravi Gupta (Fireblocks), Roelof Botha (Square now Block), Andrew Reed (Robinhood), Stephanie Zhan (stealth seed, Brud acquired by Dapper Labs) and more.  Sequoia has been investing in crypto since 2017 and backs founders pre-seed and beyond in equity and tokens.

70.   On the same day, Sequoia sent the following tweets from its official Twitter account promoting FTX, including a quote by Bankman-Fried that FTX did not "do scammy things . . . [e]ven if it is technically legal":

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21



22   71.   On January 31, 2022, FTX Trading completed its Series C fundraising round.

23   Sequoia did not participate.  The Series C round valued FTX Trading at nearly $32 billion, marking

24   a nearly 90% appreciation in Sequoia's Series B investment in just over six months.  In the three

25   months since the Meme Round, and following Sequoia's widespread promotional efforts, FTX

26   Trading's user base had grown another 60%.

27   72.   Sequoia's investment in FTX was so successful that it opened a first-of-its-kind

28   crypto-focused fund.  Ms. Bailhe continued her media blitz to promote the new fund, appearing on

*CNBC* and *Bloomberg*.  In connection with the campaign, Sequoia penned a blog post on *Medium* where it promoted its relationship with FTX and Bankman-Fried, which stated in pertinent part as follows:

> **We have partnered with an ever-growing group of some of the best founders in crypto.  From Sam Bankman-Fried at FTX**, Jack Dorsey at Block, Uri Kolodny and Eli Ben-Sasson at StarkWare, and Michael Shaulov at Fireblocks, to Elena Nadolinski at Iron Fish, Yubo Ruan at Parallel, Ming Wu at Strips and more in stealth, these founders have expanded both our thinking and how we support their unique needs.

73.     On April 13, 2022, Ms. Bailhe hosted an interview with Bankman-Fried for *Startup Grind*, a conference that bills itself as a "Global Community for Entrepreneurs."  The interview segment was entitled "The Rise of FTX."  Ms. Bailhe portrayed Bankman-Fried as a brilliant and savvy trader, prudent risk taker, and visionary founder, stating in pertinent part as follows:

> **I am thrilled to be here today with a founder that Sequoia is honored to back and that is Sam himself.  Sam is the co-founder and CEO of FTX and an exceptional founder and human in so many ways.  And so I am excited that you all will get to know the man behind the myth in this session**.

*        *        *

> Sam, to many people, you are an enigma.  You grew up in Northern California, the son of two Stanford law professors.  You graduated from MIT which is sort of an alt thing to do these days.  You actually went all four years and got a degree and were a top trader on Wall Street at Jane Street.  And somehow you blink and years later you are the CEO of a crypto exchange in the Bahamas.  **So, your trajectory is striking and I think a lot of that has to do with how well you calculate risk and upside.  So talk about the risk that you've taken in your journey as a founder and how smart risk taking has shaped you and helped get FTX to where it is today**.

*        *        *

> **Hopefully, the audience can hear the level of quantitative thinking that shapes your choices**.  I want to double click on that.  A lot of people who know you really well, Sam, call you a trader's trader.  People used to watch you trade like they watch gamers on Twitch.  FTX's original motto is by trader, for traders.  And I think your background as a trader has always given you a deep connection with your users, whether they are individual or institutional and incredible founder fit.  **But what I don't think a lot of people realize is how much it impacts your skill in taking risk**.  Is that where you first honed this thinking that you have about risk or was it something else in your life?  And how has the trading background that you have shaped you as a founder?

*        *        *

> You have done what experts will tell you not to do and **you have been right many times**.  So how do you decide when to listen to advice and from whom?

74.     Ms. Bailhe continued by highlighting Bankman-Fried's purported altruism and the values-centric culture of FTX, stating in pertinent part as follows:

> Hearing you talk about the deep sense of accountability that I think you know you had hardened through all these experiences *reminds me of a lot of the culture at FTX and it also reminds me about your subscription to the Effective Altruism movement. So you are earning to give. You plan to give away the majority of what you earn. And you have already started. You have a $100 million FTX future fund to that effect*. How do these values guide you as a founder and how do they also impact the culture at FTX?
>
> *                *                *
>
> *FTX is famously lean because you care a lot about culture and you are one of the companies that spends the most time thinking about each additional person you add to the organization*. People are always shocked to hear these stats, but I think the exact stats are that you had three developers to your first $100 million in revenue, and seven to your first billion. And I will never forget when we were at dinner with other great founders and their jaws like hit the floor when you said that. What drives your strong conviction that leaner teams are better?

75.     Ms. Bailhe also highlighted the astounding growth of FTX, stating in pertinent part as follows:

> *What's interesting to me is one of the hallmarks of FTX – both culture and product – is speed*. And you just move faster than your competition and it shows on tons of dimensions. How do you set pace as a leader? Aside from keeping the team lean, hiring the right people. *How do you set the cadence of work and how do you maintain that as you grow?*
>
> *                *                *
>
> *One of your superpowers is your unbridled ambition. This past year alone, FTX has launched several new products and I would argue made the transition from a product company to a platform company*. So you have the international exchange, you have the US exchange, you have US retail app, you have a proposal in front of the CFTC to change the way that derivatives could work in the US for crypto. And you also have a white label product so that any app that wants to add crypto trading can do that now via an API. And yet, this is a fraction of what we know you have planned. Could you talk about your long-term vision for FTX?
>
> *                *                *
>
> I remember in our first meeting when you talked about this vision, you had a way of describing it that I thought was very visceral and fun, which was: *we want to build something so that whatever you want to do with your next dollar, whether its trade crypto or send a dollar to a friend or buy a banana, that you can do it with FTX*. And it was just a great way to phrase it.

76.     On September 22, 2022, just weeks before the collapse of FTX, Sequoia published a now-deleted glowing profile of Bankman-Fried and FTX on its website. The self-published piece

1   was entitled "Sam Bankman-Fried Has a Savior Complex – And Maybe You Should Too."  The

2   piece detailed Bankman-Fried's supposed adherence to "Effective Altruism" – the idea that one

3   should earn as much as possible for benefit of humankind, as FTX and Bankman-Fried were

4   purportedly working to do.  The piece described Bankman-Fried in almost superhuman terms, as an

5   investing genius who would first revolutionize crypto trading and then the world.  The piece stated in

6   pertinent part as follows:

7          SBF's purpose in life was set: He was going to get filthy rich, for charity's sake.  All
       the rest was merely execution risk.

8
                                    *        *        *
9
       SBF's mind had been trained almost from birth to calculate.  As a schoolboy the
10     hedonic calculus of utilitarianism has him trying to maximize the utility function
       (measured in "utils," of course) for abortion.  During his teenage gaming years, his
11     mathematical abilities allowed him to sharpen his tactics – and win.  And, of course,
       every trade SBF ever made at Jane [Street] was the subject of a risk/reward
12     calculation.

13                                   *        *        *

14     He had to find a risk-neutral career path – which, if we strip away the trader-jargon,
       actually means he felt he needed to take on a lot more risk in the hopes of becoming
15     part of the global elite.  The math couldn't be clearer.  Very high risk multiplied by
       dynastic wealth trumps low risk multiplied by mere rich-guy wealth.  To do the most
16     good for the world, SBF needed to find a path on which he'd be a coin toss away
       from going totally bust.

17                                   *        *        *

18
              At this point, mid-2019, SBF decided to double down again – and scratch his
19     own itch.  He would bet Alameda's multimillion-dollar trading profits on a new
       venture: a trading exchange called FTX.  **It would combine Coinbase's stolid,
20     regulation-loving approach** with the kinds of derivatives being offered by Binance
       and others.

21                                   *        *        *

22
              'Of the exchanges that we had met and looked at, some of them had
23     regulatory issues, some of them were already public," Bailhe says.  "And then there
       was Sam.'  **The exchange that SBF had started to build, FTX, was Goldilocks-**
24     **perfect.  There was no concerted effort to skirt the law, no Zuckerbergian diktat**
       **demanding that things be broken**.  And, yet, FTX wasn't waiting to get permission
25     to innovate.  The company had based itself offshore precisely because it aspired to
       build an advanced risk engine that would support all sorts of hedging strategies.  SBF
26     himself seemed to be bred for the role of crypto exchange founder and CEO.  Not
       only had he been a top trader at a top firm – and, thus, the ideal customer – but both
27     his parents were lawyers.  '**And, so, he is committed to making the right chess
       moves for FTX to eventually be able to legally do everything they want to do in the**
28     **U.S.,' Bailhe says – 'not by asking forgiveness, but by asking permission**.'

. . . *Alameda was not immune to the exchange-level shenanigans that gave crypto as a whole its sleazy reputation. But FTX had an ambition to change that. It was built to be the exchange traders could count on*. SBF needed to get the word out. He wanted FTX to be known as the respectable face of crypto. This required ad campaigns, sponsorship deals, a charitable wing – and a war chest to pay for it all.

FTX did *need* the money, after all. *And it needed that money from credible sources so it could continue to distinguish itself from the bottom-feeders who came to crypto to fleece the suckers. So, in the summer of 2021, when FTX started to raise its Series B from a who's who of Silicon Valley VCs, Bailhe and Lin hit the 'Don't Panic' button. 'Embarrassingly, we had never tried to reach out to Sam, because we figured he didn't need us,' Bailhe admits. 'I thought they were just minting money and had absolutely no need for investors.' Learning otherwise, they quickly contacted SBF and organized a last-minute Zoom call between him and the partners at Sequoia – at four California time on a hot July Friday afternoon. Bailhe was adamant, putting her reputation with the other partners on the line: 'I'm line, "No, it's worth it. Cancel your afternoon.'"*

The Zoom went well for all concerned. SBF looked relaxed as he answered questions, talking, as he usually does, in complete paragraphs about topics of extreme complexity. Ramnik Arora, FTX's head of product and another ex-Facebook engineer, remembers the meeting clearly: 'We're getting all these questions from Sequoia toward the end. *He's absolutely fantastic*.' Arora locks eyes with me, and I am mesmerized. Arora is intense – calling to mind a Bollywood version of Adrian Brody. '*Unbelievably fantastic*,' he says, shaking his head.

Bailhe remembers it the same way: 'We had a great meeting with Sam, but the last question, which I remember Alfred asking, was, "So, everything you're building is great, but what is your long-term vision for FTX?"'

That's when SBF told Sequoia about the so-called super-app: 'I want FTX to be a place where you can do anything you want with your next dollar. You can buy bitcoin. You can send money in whatever currency to any friend anywhere in the world. You can buy a banana. You can do anything you want with your money from inside FTX.'

Suddenly, the chat window on Sequoia's side of the Zoom lights up with partners freaking out.

'*I LOVE THIS FOUNDER,' typed one partner*.

'*I am a 10 out of 10,' pinged another*.

'*YES!!!' exclaimed a third*.

What Sequoia was reacting to was the scale of SBF's vision. It wasn't a story about how we might use fintech in the future, or crypto, or a new kind of bank. It was a vision about the future of money itself – with a total addressable market of every person on the entire planet.

'I sit ten feet from him, and I walked over, thinking, *Oh, shit, that was really good*,' remembers Arora. 'And it turns out that that fucker was playing *League of Legends* through the entire meeting.'

'*We were incredibly impressed,"* Bailhe says.  *"It was one of those your-hair-is-blown-back type of meetings*.'

Not only that, Arora says, but *League of Legends* is the kind of multiplayer online battle arena video game where every four minutes or so of tactical maneuvering is punctuated by ten seconds of action known as a gank – gamer slang for 'gang killing' – where you and your team gang up on an enemy. 'There's a fight that happens, basically,' says Arora, who was watching over SBF's shoulder as he answered that final question from Sequoia, 'and I'm like, *This guy is fucking in a gank*!'

The B round raised a billion dollars.  Soon afterward came the 'meme round': $420.69 million from 69 investors.

(Emphasis added and in original.)

77.     The Sequoia article described Bankman-Fried in transcendent terms, calling him "obviously a genius," "*as good at explaining the principles of macroeconomics as anyone out there in the world today*," a "future trillionaire," and someone who was "not talking about maximizing the total value of FTX," but rather "the total value of the universe."  The article similarly described Bankman-Fried as a "risk-neutral" market player who strove to "be fully rational about maximizing his income on behalf of the poor" and "apply his trading principles across the board."

78.     The article spoke of FTX with similarly effusive praise, stating: "FTX has a remarkable corporate culture . . . that comes right from the top" with a "guilelessness, an openness." The article described FTX's extremely "[e]thical behavior" as its primary "competitive advantage" and informed readers that "the success of FTX seems like a foregone conclusion."

79.     Sequoia's official Twitter account promoted the article on September 22, 2022 and September 30, 2022, stating in pertinent part as follows:



80.     On January 18, 2023, CFTC Commissioner Goldsmith Romero delivered a speech at The Wharton School and the University of Pennsylvania Carey Law School entitled "Crypto's Crisis of Trust: Lessons Learned from FTX's Collapse."  Ms. Goldsmith Romero described the central importance of Sequoia's support for FTX in luring customers onto the FTX platforms, stating in pertinent part as follows:

> ***FTX appears to have used Sequoia as a credibility and trust enhancer, and it used Sequoia's money to embark on a campaign to gain public trust and distinguish itself as the most trusted brand in crypto***.
>
> ***It appears that Sequoia at least knew its money would be used in this fashion***.  However, there are serious questions and allegations about whether this public-relations 'war chest' was funded not only by venture capital money but also

customer property.  If those allegations prove to be true, this could be one of the most significant breaches of trust in financial history.

***The multi-dimensional public relations campaign was meant to build the public's trust in FTX***.  And I have not discussed all elements of that campaign.  There were rumored efforts to influence charities and policy advocacy groups.  There were efforts relating to FTX's extensive legal and political spending; and even an alleged investment in a crypto news site.  ***All of this appears to be part of a branding campaign designed to make FTX appear trustworthy***.

FTX's violation of the trust it built through this campaign deepened the trust deficit for an unregulated crypto industry already badly damaged by the collapse of TerraUSD, Three Arrows Capital, Celsius and Voyager.  The crypto industry is left with a crisis of trust.

**History of Thoma Bravo**

81.     Thoma Bravo is a private equity firm headquartered in Chicago, with primary offices in Miami and San Francisco.  The predecessor firm to Thoma Bravo, Golder Thoma & Co. ("Golder Thoma"), was founded in 1980 by Stanley Golder and Carl Thoma.  Golder Thoma pioneered the "buy-and-build" investment strategy in which the firm would use primarily debt to take a controlling stake in an existing company (also called a "leveraged buyout" or "LBO").  The firm then works with the acquired company's management to transform into a larger and more profitable business through internal growth and a series of strategic, industry consolidating acquisitions.  Through several iterations, Golder Thoma came to be known as Thoma Bravo.

82.     Orlando Bravo, Thoma Bravo's founder and managing partner, was born in Puerto Rico and moved to Florida in his early teens.  He attended college at Brown University before earning his law degree from Stanford Law School and his Master of Business Administration degree from Stanford's Graduate School of Business.  While attending law school at Stanford, one of his professors was Bankman-Fried's father, Joseph Bankman.

83.     Following graduate school, Mr. Bravo began working on mergers and acquisitions for Morgan Stanley.  After Morgan Stanley, Mr. Bravo joined Thoma Bravo's predecessor firm, Thoma Cressey Equity Partners.  After leading several successful deals, Mr. Bravo eventually became a named partner at the firm, leading it to become in 2008 what is now known as Thoma Bravo.

84.     Mr. Bravo is a well-known, successful private equity professional, being dubbed "Wall Street's best dealmaker" by *Forbes* in 2019, and "private equity's king of Saas" by the

*Financial Times* in 2021.  As of September 30, 2022, Thoma Bravo had more than $120 billion in assets under management.

**Thoma Bravo Promotes FTX and Bankman-Fried**

85.     Thoma Bravo invested for the first time in FTX during the same July 2021 Series B funding round that Sequoia also made its first investment in, investing $125 million.  Thoma Bravo invested in both FTX US and FTX Trading's common and preferred shares through at least two funds: Thoma Bravo Growth Fund A, L.P. and Thoma Bravo Growth Fund, L.P. (together "Growth Funds").  Thoma Bravo acquired at least 19,654,000 shares of common stock and 8,954,773 shares of preferred stock.

86.     In Thoma Bravo's investment adviser brochure to the SEC, the firm stated that it undertakes "formal due diligence on prospective investment opportunities" for the Growth Funds:

> *Undertake Due Diligence Process*
>
> Thoma Bravo's formal due diligence on prospective investment opportunities is intended to provide Thoma Bravo with an accurate picture of the investment opportunity.  Thoma Bravo expects to undertake specific due diligence procedures to evaluate important aspects of a prospective portfolio company.  The effort may include interviews with industry competitors, customers, suppliers and former employees and an analysis of relevant issues, risks and opportunities.  Thoma Bravo expects to utilize Operating Partners and their expertise, experience and insights in the process. External resources to complement the firm's own internal abilities and expertise also are expected to be utilized, including accounting, legal, insurance and/or information technology experts. In addition to customary analysis of the market opportunity, competitive position and financial performance, Thoma Bravo expects to undertake an evaluation of a company's business model to determine whether pricing and packaging changes can be made to potentially accelerate revenue growth.  Thoma Bravo expects to apply its experience with numerous growth companies of the Buyout Funds to understand the growth profiles of potential platform companies.

87.     Once an investment is made, Thoma Bravo also claims to perform the following due diligence to monitor its investments in the Growth Funds:

> *Monitor Investments and Work Collaboratively with Management*
>
> In most cases upon the closing of an investment, Thoma Bravo expects to work with management, providing guidance based on expertise from decades of investing in Software companies.  The investment teams intend to maintain contact with management and attend board meetings and operational reviews.  Although a Growth Fund typically will not control a portfolio company, the firm expects to be proactive in shaping potential improvement and to work with management teams to highlight areas of operations that Thoma Bravo believes can be improved to drive

higher revenues, including pricing and delivery of Software and support services, salesforce reorganizations, and sales channel structures.

88.     Thoma Bravo also stated that it has a high standard for custody of its own digital assets, discussed "cold wallets" and the steps it takes to protect its own keys:

> The General Partner of a Growth Fund will be responsible for arranging for custody of such any Digital Assets held by a Growth Fund, including by storage in one or more "cold wallets" and/or on various Digital Asset exchanges.  In certain instances, an issuer will hold a Growth Fund's Digital Assets following a network launch for a period of time prior to engagement of a third party custodian or implementation of a self-custody solution for such assets. Digital Asset exchanges may require a General Partner to provide control of applicable private keys when such exchanges are utilized by the relevant Growth Fund.  Thoma Bravo will take such steps as it determines are necessary to maintain access to these keys and to prevent their exposure to hacking, malware and general security threats, but there can be no assurance that such steps will be adequate to protect such keys or a Growth Fund's Digital Assets from such threats or that there will be no failure or penetration of the applicable security systems.

89.     Following the $900 million funding round, Mr. Bravo sounded his praises for Bankman-Fried and FTX in a press release issued by FTX, which was also posted on the Thoma Bravo website, stating in pertinent part as follows:

> We have watched with excitement as ***Sam and the FTX team have successfully built the most cutting-edge, sophisticated cryptocurrency exchange in the world***.  While this has been an incredible accomplishment in itself, their commitment to making a positive impact on the world through their business is what sets the company apart.  We are thrilled to partner with FTX on their next phase of growth as they create a new ecosystem for crypto.

90.     Also in July 2021, Mr. Bravo took to Twitter to endorse FTX and Bankman-Fried:

91.     However, at the time, Thoma Bravo failed to disclose that its investment in FTX had arisen from Mr. Bravo's personal relationship with Bankman-Fried's father.  As the *Financial Times* would later reveal in a November 11, 2022 article: "It was a surprise phone call from an old university professor that launched private equity investor Orlando Bravo into becoming one of the most prominent and vocal supporters of Sam Bankman-Fried and his crypto trading firm FTX."  The article continued in pertinent part as follows:

> The call was from Joseph Bankman, a professor of law and business at Stanford University who had taught Bravo in the late 1990s.  At the time, in mid-2021, Bravo's $122bn private equity firm Thoma Bravo was opening an office in Miami, the city where Bankman's son Sam had just paid $135mn for a 19-year naming rights contract with the local NBA team.

> Bankman told Bravo his son was looking for guidance on philanthropic projects in Miami to further his 'effective altruism' mission.  Only after they spoke did Bravo learn that Bankman-Fried was also in the process of raising a $900mn Series B funding round at a $18bn valuation, with a who's who of investors including Sequoia Capital, BlackRock and SoftBank.  He quickly called Bankman back seeking an introduction and a way into the deal, which was progressing quickly and would be the largest capital raising in crypto exchange history.

> When Bravo and a partner Tre Sayle began due diligence for the funding round, they were taken aback by FTX's numbers.  The two-year-old start-up led by a relatively small staff of young traders was on course to earn over $200mn in operating profit for the year, unprecedented margins for an early-stage growth company that would normally be losing money.  Bravo was blown away.  Thoma Bravo invested more than $125mn in the round in June 2021, becoming one of FTX's largest backers.

92.     As a member of FTX's Advisory Board (through Robert (Tre) Sayle), Thoma Bravo continued to laud FTX during the Class Period, attempting to lure users to the FTX exchange which, in turn, made Thoma Bravo's stake in FTX more valuable.  On November 27, 2021, in response to a tweet warning crypto traders to "[o]nly trade [bitcoin] on a legitimate exchange you trust," Mr. Bravo emphasized the purported trustworthiness of FTX.  Mr. Bravo urged his Twitter followers to "[o]nly trade [bitcoin] with [FTX]," stating in pertinent part as follows:



93.     Mr. Bravo continued making media rounds in order to promote Bankman-Fried and FTX.  For example, on January 4, 2022, Mr. Bravo was quoted in a *MarketWatch* article describing Bankman-Fried's "incredible" execution and stating: "'He combines being visionary with being a phenomenal operator . . . .  That is rare.'"

94.     On April 8, 2022, Mr. Bravo appeared on *The Scoop* podcast with financial journalist Frank Chaparro.  Mr. Bravo heaped praise on Bankman-Fried and FTX, stating in pertinent part as follows:

[Chaparro:] What advice do you give to an FTX to really stampede the competition and stand out?

[Bravo:] Well FTX is already doing that.  FTX doesn't need a lot of advice.  That's the great thing.  ***It is so unusual to find a leader like Sam that combines an incredible strategic mindset with at the same time an exceptional operational and execution rhythm to the business***.  You usually find greatness in one or the other and you have to adjust to the culture of the company and their strengths.  In the case of FTX, you have both plus a pioneer plus a company that has such a big cultural mission that is beyond any individual.  Companies like that you don't just run across very often – even in a decade.

95.     On June 7, 2022, Mr. Bravo endorsed a tweet by Bankman-Fried where he claimed that FTX would keep growing even as other businesses cut jobs.  As reflected below, Mr. Bravo responded, "This is exactly right":



96.     On June 23, 2022, Mr. Bravo highlighted the "rigorous operations" of FTX as other crypto firms struggled during a crypto downturn, stating in pertinent part as follows:



97.     On September 21, 2022, Mr. Bravo spoke at the 2022 IPEM conference in Cannes, France.  IPEM is an international conference for professionals in the private equity and venture capital community.  More than 5,000 industry professionals attended the conference.  While

speaking at IPEM, Mr. Bravo announced to other professional investors that FTX was going to be "a big winner," and he described Bankman-Fried as "one of the best entrepreneurs" he had come across in his entire career.

98.     Just three days later, on September 25, 2022, the *Financial Times* published an article chronicling an interview with Mr. Bravo where he singled out FTX and Bankman-Fried as worthy investment opportunities which stood out from the overall crypto sector, stating in pertinent part as follows:

> 'I've gotten to know that world a little bit more, and some of the business practices don't rise to the level of ethics that we're all used to in private equity with your investors and your customers and your community, and that has been a bit disappointing,' [Bravo] said.
>
> Bravo, who has said he personally owns bitcoin, criticized the crypto market for what he called a 'disturbing" lack of transparency.  But he stressed that he was still bullish about bitcoin and believed the industry was "just young" and ethical problems would "get fixed over time'.
>
> *            *            *
>
> However, he said, **the firm would 'certainly look at' putting more money into FTX if it held another funding round**.  The Bahamas-based crypto company was going to be 'a big winner', he said, describing 30-year-old Bankman-Fried as 'one of the best entrepreneurs' he had come across.
>
> Bravo's comments came as he and other dealmakers from around the world gathered for the IPEM private equity conference in Cannes and as the economic conditions that propelled a decade-long boom in the industry go into reverse.

99.     Just weeks later, on November 11, 2022, FTX filed for bankruptcy.  Billions of dollars in depositor funds remain misappropriated.  Many lost their life savings because they had done exactly what Mr. Bravo had urged: only trading bitcoin on FTX.

**History of Paradigm**

100.    Paradigm is a venture capital firm focused "on supporting the crypto/Web3 companies and protocols of tomorrow."  The firm was founded in 2018 by ex-Sequoia partner, Matt Huang, and Coinbase founder, Fred Ehrsam.

101.    After graduating with a degree in mathematics from the Massachusetts Institute of Technology, Mr. Huang founded Hotspots, Inc. – an analytics company.  Hotspots was eventually acquired by Twitter and Mr. Huang joined the Twitter Ads team.  Following his time at Twitter, Mr.

Huang found success as a venture capitalist at Sequoia, where he gained experience investing in pre-IPO companies.  After four years at Sequoia, Mr. Huang partnered with Mr. Ehrsam to found Paradigm – a venture capital firm focused on funding blockchain and web3 companies.  In just a few years, Mr. Huang and Mr. Ehrsam grew Paradigm into a venture capital powerhouse with billions of dollars in assets under management.  From December 2020 through April 2022, Paradigm grew its assets under management by more than 300%.  Mr. Huang has ample experience in successful venture capital raises, having participated as an investor in ByteDance (TikTok's parent company) and Instacart, among others.

102.    Since founding Paradigm, Mr. Huang has gained an immense following and is highly respected in the blockchain/crypto industry.  Currently, Mr. Huang boasts well over 100,000 followers on Twitter and has the attention of tens of thousands within the crypto community.

**Paradigm Promotes FTX and Bankman-Fried**

103.    Paradigm's first investment in FTX came in the July 20, 2021 Series B funding round.

104.    In Paradigm's investment adviser brochure to the SEC, the firm stated that its funds "primarily invest in blockchain assets, crypto-related assets, and crypto and cryptorelated companies, projects, and protocols."  In the same brochure, Paradigm also details its understanding of the risks associated with crypto assets and specifically highlights the risks of "Crypto Asset Exchanges".  Demonstrating its recognition of the need to monitor digital transactions, Paradigm further states "[t]he Funds will take credit risk of an exchange every time it transacts."

105.    Paradigm also stated in its brochure to the SEC that it conducts "reasonable and appropriate" due diligence for each investment:

> Before making investments, the Adviser will conduct due diligence that it deems reasonable and appropriate based on the facts and circumstances applicable to each investment.  When conducting due diligence, the Adviser may be required to evaluate important and complex business, financial, tax, accounting, and legal issues.

106.    Following the funding round, Mr. Huang described Bankman-Fried as a visionary founder and emphasized the excellent "execution" of FTX in a press release issued by FTX to promote its platforms, stating in pertinent part as follows:

***Sam Bankman-Fried is one of those special founders whose vision is both stunningly ambitious and uniquely adapted to the future of crypto. The team's execution speaks for itself***, with FTX growing to become a top global exchange in two years. There's a bright future ahead for Sam and FTX, and Paradigm is excited to be a part of it.

107.    After witnessing its initial investment in FTX Trading's Series B funding round quickly appreciate, in November 2021, Paradigm set out to raise $2.5 billion from investors for a crypto-centric venture fund, called "Paradigm One." Just two months later, in January 2022, the Paradigm One fund invested in FTX Trading's Series C funding round, which valued FTX Trading at nearly $32 billion.

108.    In total, Paradigm invested in FTX US's common and preferred shares and FTX Trading's preferred shares through at least two funds: Paradigm Green Fortitudo LP and Paradigm One LP fund. Paradigm acquired at least 6,551,000 common shares and 19,689,119 shares of preferred stock.

109.    In a February 23, 2022 press release, Mr. Huang (a member of FTX's Advisory Board) praised FTX's "great products and regulatory engagement," stating in pertinent part as follows:

Paradigm has been fortunate to be an investor in FTX's global business, and we are thrilled to invest in FTX.US. The team is world class and their focus on great products and regulatory engagement will help ensure access to crypto for millions of Americans.

110.    On September 9, 2022, Mr. Huang retweeted a response by Bankman-Fried to one of Mr. Huang's tweets which stated: "[I]t's really important that the gateways to the financial world take their duty extremely seriously to prevent financial crimes." By promoting and distributing the tweet, Mr. Huang signaled his agreement that Bankman-Fried had in fact taken significant measures to prevent financial crimes in the crypto space, as illustrated in the following exchange:

111.    By November 2022, FTX's and Defendants' deceit had come unraveled, costing investors billions of dollars in losses. Mr. Huang wrote an apologetic tweet to his followers in which he revealed that Paradigm itself had never used any of FTX's platforms, even as he had encouraged others to do so:



**Defendants' Fraudulent Scheme and**
**Deceptive Course of Conduct**

112.    As detailed above, Defendants represented to Plaintiffs and the Class that they had performed adequate due diligence supporting their substantial FTX investments; that FTX's products and services were safe, trustworthy, and reliable; that Bankman-Fried was a visionary crypto founder whose sole focus was on the greater good rather than profiting at the expense of others; that FTX was being competently run with extraordinary execution; and that FTX and Bankman-Fried had strictly complied with all legal and regulatory requirements to safeguard their customers' assets, which included ensuring that funds deposited by FTX platform users would be segregated for safekeeping.

113.    Defendants knew, or should have known, that these representations were materially false and misleading when made.  If Defendants performed the due diligence activities that they

1 claimed to have performed with respect to FTX, they would have been apprised through such

2 activities of the wanton fraud and self-dealing and the complete lack of internal controls and

3 competency present at FTX.  Defendants had knowledge that FTX was not operating in the manner

4 that Defendants had represented to consumers and the market as a result of their experience and

5 relationship with FTX, and their statements to the contrary during the Class Period did not have a

6 reasonable factual basis.

7 114.    Defendants' unfair and deceptive statements described herein are likely to mislead –

8 and clearly have misled – consumers and investors acting reasonably in the circumstances into

9 depositing funds and/or cryptocurrency into FTX.

10 115.    Defendants' unfair and deceptive statements described herein were likely to have

11 misled – and indeed did mislead – consumers acting reasonably under the circumstances in

12 purchasing, transacting, or depositing fiat current or crypto assets in accounts with FTX during the

13 Class Period.

14 116.    Defendants' conduct has caused Class members to suffer billions of dollars in losses,

15 as FTX ultimately collapsed and fell into bankruptcy.

16 **The Truth Emerges**

17 117.    FTX's rapid growth story began to unravel on November 2, 2022, when an article

18 published by the cryptocurrency publication *CoinDesk* questioned the financial health of Alameda

19 and FTX and revealed that Alameda held billions of dollars' worth of FTT Token, the native FTX

20 token.  Specifically, the article, entitled "Divisions in Sam Bankman-Fried's Crypto Empire Blur on

21 His Trading Titan Alameda's Balance Sheet," stated in pertinent part as follows:

22 Billionaire Sam Bankman-Fried's cryptocurrency empire is officially broken
into two main parts: FTX (his exchange) and Alameda Research (his trading firm),

23 both giants in their respective industries.

24 But even though they are two separate businesses, the division breaks down
in a key place: on Alameda's balance sheet, according to a private financial

25 document reviewed by CoinDesk.  (It is conceivable the document represents just
part of Alameda.)

26

27 That balance sheet is full of FTX – specifically, the FTT token issued by the
exchange that grants holders a discount on trading fees on its marketplace.  While
there is nothing per se untoward or wrong about that, it shows Bankman-Fried's

28 trading giant Alameda rests on a foundation largely made up of a coin that a sister

company invented, not an independent asset like a fiat currency or another crypto. The situation adds to evidence that the ties between FTX and Alameda are unusually close.

The financials make concrete what industry-watchers already suspect: Alameda is big.  As of June 30, the company's assets amounted to $14.6 billion.  Its single biggest asset: $3.66 billion of 'unlocked FTT.'  The third-largest entry on the assets side of the accounting ledger?  A $2.16 billion pile of 'FTT collateral.'

There are more FTX tokens among its $8 billion of liabilities: $292 million of "locked FTT."  The liabilities are dominated by $7.4 billion of loans.

'It's fascinating to see that the majority of the net equity in the Alameda business is actually FTX's own centrally controlled and printed-out-of-thin-air token,' said Cory Klippsten, CEO of investment platform Swan Bitcoin, who is known for his critical views of altcoins, which refer to cryptocurrencies other than bitcoin (BTC).

*       *       *

Other significant assets on the balance sheet include $3.37 billion of 'crypto held' and large amounts of the Solana blockchain's native token: $292 million of 'unlocked SOL,' $863 million of 'locked SOL' and $41 million of 'SOL collateral.' Bankman-Fried was an early investor in Solana.  Other tokens mentioned by name are SRM (the token from the Serum decentralized exchange Bankman-Fried co-founded), MAPS, OXY and FIDA.  There is also $134 million of cash and equivalents and a $2 billion 'investment in equity securities.'

Also, token values may be low.  In a footnote, Alameda says 'locked tokens conservatively treated at 50% of fair value marked to FTX/USD order book.'

Owners of the FTT token get discounts on FTX trading fees, increased commissions on referrals and earn rewards.  The value of FTT is maintained by FTX's rolling program of buying back and burning tokens, a process that eats up a third of the exchange's trading commissions, which will continue until half of all tokens are burned, according to FTX.

118.    Shortly after the *CoinDesk* article was published, FTX suffered massive customer withdrawals, resulting in a liquidity crisis.

119.    On November 6, 2022, Binance, a competing crypto asset trading platform, commented that "[d]ue to recent revelations that have came [sic] to light," Binance would be liquidating its FTT holdings, which had been valued at the time at over $500 million.  This announcement caused a collapse in the price of FTT Tokens and accelerated the pace of customer withdrawals from the FTX platforms.

120.    Then, on November 8, 2022, Binance announced that it had reached a non-binding deal to acquire FTX Trading.  However, only one day later, Binance stated that "as a result of [its]

1  corporate due diligence . . . [Binance had] decided that [it would] not pursue the potential acquisition

2  of FTX[]" and that "the issues [were] beyond [Binance's] control or ability to help."

3      121.    Ultimately, by November 8, 2022, Bankman-Fried had elected to freeze all

4  withdrawals of customer assets.  As a result, the price of FTT Tokens declined by 80%, and

5  Alameda's collateral on deposit had a value lower than the amount Alameda had borrowed from

6  FTX.  This resulted in FTX having billions of dollars' worth of unrecoverable loans outstanding to

7  Alameda.

8      122.    On November 9, 2022, Sequoia sent the following letter to its limited partners:

9           We are in the business of taking risk.  Some investments will surprise to the
           upside, and some will surprise to the downside.  We do not take this responsibility
10          lightly and do extensive research and thorough diligence on every investment we
           make.  ***At the time of our investment in FTX, we ran a rigorous diligence process***.
11          In 2021, the year of our investment, FTX generated approximately $1B in revenue
           and more than $250M in operating income, as was made public in August 2022.
12

13      123.    In contrast to Sequoia's claim that it does "extensive research and thorough diligence

14  on every investment we make," *The Wall Street Journal* reported that on a subsequent call with

15  investors, Sequoia stated that "the firm would improve its due-diligence process on future

16  investments" and "the firm in the future will be in a position to have even early-stage startups'

17  financial statements audited by one of the Big Four accounting firms."

18      124.    On November 10, 2022, Bankman-Fried took to Twitter and issued a series of 22

19  tweets apologizing to customers and attempting to offer an explanation for the crash, as detailed

20  below:

21  

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SBF ✔
@SBF_FTX

2) I also should have been communicating more very recently.

Transparently--my hands were tied during the duration of the possible Binance deal; I wasn't particularly allowed to say much publicly.  But of course it's on me that we ended up there in the first place.

SBF ✔
@SBF_FTX

3) So here's an update on where things are.

[THIS IS ALL ABOUT FTX INTERNATIONAL, THE NON-US EXCHANGE.  FTX US USERS ARE FINE!]

[TREAT ALL OF THESE NUMBERS AS ROUGH.  THERE ARE APPROXIMATIONS HERE.]

9:13 AM - Nov 10, 2022

SBF ✔
@SBF_FTX

4) FTX International currently has a total market value of assets/collateral higher than client deposits (moves with prices!).

But that's different from liquidity for delivery--as you can tell from the state of withdrawals.  The liquidity varies widely, from very to very little.

9:13 AM - Nov 10, 2022

SBF ✔
@SBF_FTX

5) The full story here is one I'm still fleshing out every detail of, but as a very high level, I fucked up twice.

The first time, a poor internal labeling of bank-related accounts meant that I was substantially off on my sense of users' margin.  I thought it was way lower.

9:13 AM - Nov 10, 2022

SBF ✓
@SBF_FTX

6) My sense before:

Leverage: 0x
USD liquidity ready to deliver: 24x average daily
withdrawals

Actual:

Leverage: 1.7x
Liquidity: 0.8x Sunday's withdrawals

Because, of course, when it rains, it pours.  We saw
roughly $5b of withdrawals on Sunday--the largest by a
huge margin.

9:13 AM · Nov 10, 2022

SBF ✓
@SBF_FTX

7) And so I was off twice.

Which tells me a lot of things, both specifically and
generally, that I was shit at.

And a third time, in not communicating enough.  I
should have said more.  I'm sorry--I was slammed with
things to do and didn't give updates to you all.

9:13 AM · Nov 10, 2022

SBF ✓
@SBF_FTX

8) And so we are where we are.  Which sucks, and
that's on me.

I'm sorry.

9:13 AM · Nov 10, 2022

SBF ✓
@SBF_FTX

9) Anyway: right now, my #1 priority--by far--is doing
right by users.

And I'm going to do everything I can to do that.  To take
responsibility, and do what I can.

9:13 AM · Nov 10, 2022

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**SBF** ✓
@SBF_FTX

10) So, right now, we're spending the week doing everything we can to raise liquidity.

I can't make any promises about that. But I'm going to try. And give anything I have to if that will make it work.

9:13 AM · Nov 10, 2022

**SBF** ✓
@SBF_FTX

11) There are a number of players who we are in talks with, LOIs, term sheets, etc.

We'll see how that ends up.

9:13 AM · Nov 10, 2022

**SBF** ✓
@SBF_FTX

12) Every penny of that--and of the existing collateral-- will go straight to users, unless or until we've done right by them.

After that, investors--old and new--and employees who have fought for what's right for their career, and who weren't responsible for any of the fuck ups.

9:13 AM · Nov 10, 2022

**SBF** ✓
@SBF_FTX

13) Because at the end of the day, I was CEO, which means that "I" was responsible for making sure that things went well. "I", ultimately, should have been on top of everything.

I clearly failed in that. I'm sorry.

9:13 AM · Nov 10, 2022

**SBF** ✓
@SBF_FTX                                              ...

14) So, what does this mean going forward?

I'm not sure--that depends on what happens over the
next week.

But here are some things I know.

9:13 AM · Nov 10, 2022

**SBF** ✓
@SBF_FTX                                              ...

15) First, one way or another, Alameda Research is
winding down trading.

They aren't doing any of the weird things that I see on
Twitter--and nothing large at all.  And one way or
another, soon they won't be trading on FTX anymore.

9:13 AM · Nov 10, 2022

**SBF** ✓
@SBF_FTX                                              ...

16) Second, in any scenario in which FTX continues
operating, its first priority will be radical transparency--
transparency it probably always should have been
giving.

Giving as close to on-chain transparency as it can: so
that people know  "exactly" what is happening on it.

9:13 AM · Nov 10, 2022

**SBF** ✓
@SBF_FTX                                              ...

17) All of the stakeholders would have a hard look at
FTX governance.  I will not be around if I'm not wanted.

All of the stakeholders--investors, regulators, users--
would have a large part to play in how it would be run.

Solely trust.

9:13 AM · Nov 10, 2022

SBF ✓
@SBF_FTX

18) But all of that isn't what matters right now--what matters right now is trying to do right by customers. That's it.

9:13 AM · Nov 10, 2022

SBF ✓
@SBF_FTX

19) A few other assorted comments:

This was about FTX International.  FTX US, the US based exchange that accepts Americans, was not financially impacted by this shitshow.

It's 100% liquid.  Every user could fully withdraw (modulo gas fees etc).

Updates on its future coming.

9:13 AM · Nov 10, 2022

SBF ✓
@SBF_FTX

20) At some point I might have more to say about a particular sparring partner, so to speak.

But you know, glass houses.  So for now, all I'll say is:

well played; you won.

9:13 AM · Nov 10, 2022

SBF ✓
@SBF_FTX

21) NOT ADVICE, OF ANY KIND, IN ANY WAY

I WAS NOT VERY CAREFUL WITH MY WORDS HERE, AND DO NOT MEAN ANY OF THEM IN A TECHNICAL OR LEGAL SENSE; I MAY WELL HAVE NOT DESCRIBED THINGS RIGHT though I'm trying to be transparent.  I'M NOT A GOOD DEV AND PROBABLY MISDESCRIBED SOMETHING.

9:13 AM · Nov 10, 2022

SBF ✓
@SBF_FTX

22) And, finally:

I sincerely apologize.

We'll keep sharing updates as we have them.

9:13 AM · Nov 10, 2022

125.    Then, on November 12, 2022, *The Wall Street Journal* published an article entitled "Alameda, FTX Executives Are Said to Have Known FTX Was Using Customer Funds," which revealed that FTX customer funds had been used to prop up Alameda.  The article stated in pertinent part as follows:

> Alameda Research's chief executive and senior FTX officials knew that FTX had lent its customers' money to Alameda to help it meet its liabilities, according to people familiar with the matter.
>
> Alameda's troubles helped lead to the bankruptcy of FTX, the crypto exchange founded by Sam Bankman-Fried.  Alameda is a trading firm also founded and owned by Mr. Bankman-Fried.
>
> Alameda faced a barrage of demands from lenders after crypto hedge fund Three Arrows Capital collapsed in June, creating losses for crypto brokers such as Voyager Digital Ltd., the people said.
>
> In a video meeting with Alameda employees late Wednesday Hong Kong time, Alameda CEO Caroline Ellison said that she, Mr. Bankman-Fried and two other FTX executives, Nishad Singh and Gary Wang, were aware of the decision to send customer funds to Alameda, according to people familiar with the video.  Mr. Singh was FTX's director of engineering and a former Facebook employee.  Mr. Wang, who previously worked at Google, was the chief technology officer of FTX and cofounded the exchange with Mr. Bankman-Fried.
>
> Ms. Ellison said on the call that FTX used customer money to help Alameda meet its liabilities, the people said.
>
> Alameda had taken out loans to fund illiquid venture investments, the people said.
>
> On Friday, FTX, Alameda, FTX US and other FTX affiliates filed for bankruptcy protection.
>
> Bankruptcy means that it could be a long time before individual investors and others owed their funds are able to potentially recover any of them, if ever.

126.     *The Wall Street Journal* article's revelation that customer assets were being used to cover Alameda's trading losses and repay its outstanding debts demonstrated that FTX had been operating in direct contradiction of FTX's terms of service, which explicitly stated that customer assets would not be transferred to FTX trading.

127.     Shortly after the foregoing disclosures, Bankman-Fried resigned as CEO of FTX and FTX, Alameda, and other Bankman-Fried entities filed for bankruptcy.  In a Delaware bankruptcy court filing, FTX's new CEO John J. Ray III stated that he had never seen "such a complete failure of corporate controls and such a complete absence of trustworthy financial information as occurred here. . . .  [T]his situation is unprecedented."

128.     Thereafter, on November 30, 2022, Bankman-Fried granted an interview to *New York Times* reporter Andrew Ross Sorkin, during which Bankman-Fried accepted responsibility for FTX and Alameda's failures.  Among other statements, Bankman-Fried acknowledged: "'I was responsible ultimately for doing the right things and I mean, we didn't.  Like, we messed up big.'"  According to *Forbes*, Bankman-Fried intended to make a similar *mea culpa* to Congress before he lost his job, planning to state, "I f****d up."

129.     On December 12, 2022, Bankman-Fried was arrested in the Bahamas on the eve of what would have been roughly his fourth time providing testimony to a congressional committee in a one-year period.  Accordingly, the scheduled congressional testimony for December 13, 2022 was provided by Mr. Ray, wherein Mr. Ray confirmed a host of adverse facts about what his investigation to date into FTX had uncovered or confirmed.  During his prepared remarks to Congress, Mr. Ray stated, in pertinent part, the following:

> While many things are unknown at this stage, and many questions remain, we know the following:
>
> ***First***, customer assets from FTX.com were commingled with assets from the Alameda trading platform.
>
> ***Second***, Alameda used client funds to engage in margin trading which exposed customer funds to massive losses.
>
> ***Third***, the FTX Group went on a spending binge in late 2021 through 2022, during which approximately $5 billion was spent buying a myriad of businesses and investments, many of which may be worth only a fraction of what was paid for them.

*Fourth*, loans and other payments were made to insiders in excess of $1 billion.

*Fifth*, Alameda's business model as a market maker required deploying funds to various third party exchanges which were inherently unsafe, and further exacerbated by the limited protections offered in certain foreign jurisdictions.

(Emphasis in original.)

130.     On January 6, 2023, Reuters reported that the SEC was probing certain FTX investors' due diligence process, and had begun asking for documents relating to these investments in the Company.

**Additional Post-Class Period False and**
**Misleading Statements by Defendant Sequoia to Cover**
**Up Its Knowledge of the Fraudulent Conduct by FTX**

131.     As the extent of FTX and Alameda's fraudulent conduct began to come to light, Defendants began making public statements to avoid scrutiny, and conceal the extent of their knowledge and involvement.

132.     On November 18, 2022, Doug Leone, general partner of Sequoia spoke at a venture capital conference called Slush, a "founder-focused" event.  In a coordinated interview with fellow Sequoia partner Luciana Lixandru asking questions, Mr. Leone stated that there wasn't much his firm could do to discover the fraud at FTX claiming that Sequoia had done careful due diligence:

*I can tell you we've done careful due diligence* but what you see at the end of a quarter in a due diligence statement doesn't reflect what someone may have done in the middle of the quarter.  *We've looked at it, there's nothing much we could have done any differently and we do not want to lose our virginity, our true belief to align ourselves with you and to dream with you*.  I think we lose that and we are out of business.

133.     On January 12, 2023, Alfred Lin, from Sequoia, sat for an interview with Connie Loizos from the news outlet StrictlyVC.  When asked what went wrong with "one of the worst investments in the history of venture capital," Mr. Lin tried to minimize Sequoia's involvement saying "[i]f you lop off some zeros, one zero, it would be $15 million out of a $630 million fund. And if you look at it that way, which is how we looked at it from a risk management standpoint for Global Growth Fund Three, you'd be like, fine, we can take a $15 million loss out of a $630 million venture fund, and that's how we kind of looked at it from a risk management standpoint."

134.     Mr. Lin also tried to deny any responsibility claiming Sequoia was misled, but in doing so repeated again that Sequoia actually did do extensive research and diligence:

> [Lin] We've reflected on it, we looked at the diligence package again and again on whether . . . what we missed. ***We do extensive research and diligence when we make an investment. This was, this happened for this investment as well. And, I think in retrospect, we looked at a bunch of things***, but we were . . . look, you know, sort of, [cough] reflecting on it we believe we were misled for a variety of situations and we'll find out when the court documents and investigations happen a lot more closely.

> [Loizos] I mean, I guess and also, you know, you are a math whiz.  You studied applied mathematics and statistics. Were you given fake numbers?  I mean, what did you have to look at?

> [Lin] ***We looked at balance sheets.  We looked at organizational charts of where the subsidiaries were.  We looked at how much Alameda was, a percentage of FTX's volume.  We looked at a variety of things***.  The company Alameda, we knew was a hedge fund. ***We knew that they were trading on FTX***, but it was not on any of FTX's organizational charts.  So we thought that they were, when we asked, are these two companies independent?  And we were told that they were . . . so.

135.     Lin also made the following false and misleading statements concerning Sequoia's "board" representation in the FTX entities:

> [Loizos] And, you know, ***I think another thing that obviously shocked everybody was that there was no board***.  And you invested something like $200 million across a couple of funds.  In retrospect, was that a responsible decision?  Was it ever that you wanted to be on the board and they said, you know, you can't be part of the deal in that case?  Or, what was that discussion like?

> [Lin] . . . So in some sense and, yes, should we have asked for more board representation? ***We could have***.  But at the same time, they didn't think that we deserved to be on the board because we owned less than 1% of the company.

136.     Contrary to Mr. Lin's assertions, defendant Sequoia (through Mr. Lin's representation) was a member of FTX's Advisory Board and had ample access to the Company's financials and internal reporting (or lack thereof), including its purported balance sheets and organizational charts.

**The Interim Bankruptcy Report**

137.     On April 9, 2023, Mr. Ray filed with the United States Bankruptcy Court for the District of Delaware a report he made to the newly appointed independent directors of FTX and Alameda covering the control failures he had thus far identified ("Bankruptcy Report").  As stated plainly in the Bankruptcy Report:

Normally, in a bankruptcy involving a business of the size and complexity of the FTX Group,[4] particularly a business that handles customer and investor funds, there are readily identifiable records, data sources, and processes that can be used to identify and safeguard assets of the estate. ***Not so with the FTX Group.***

Upon assuming control, the Debtors[5] found ***a pervasive lack of records and other evidence at the FTX Group of where or how fiat currency and digital assets could be found or accessed, and extensive commingling of assets***. This required the Debtors to start from scratch, in many cases, simply to identify the assets and liabilities of the estate, much less to protect and recover the assets to maximize the estate's value.

138.     The Bankruptcy Report further details the stunning pervasive control failures throughout FTX (and Alameda), which are entirely inconsistent with Defendants' statements promoting FTX as a high-quality, global crypto exchange.

139.     Beginning with the three individuals that controlled FTX and Alameda, Bankman-Fried, Mr. Nishad Singh ("Singh"), and Mr. Gary Wang ("Wang") had "***no experience*** in risk management or running a business" and board oversight "was also ***effectively non-existent***." FTX and Alameda were so disorganized that they ***did not even have any "tracking of intercompany relationships and ownership of particular entities***," and ***did not even have "any comprehensive organizational chart" for its entities or "complete lists of who its employees were***."

140.     The Bankruptcy Report detailed a complete lack of financial and accounting controls, unsuitable for basic financial transactions, much less the safekeeping of assets or acting as an exchange. "***The FTX Group did not have personnel who were experienced and knowledgeable enough to account accurately for assets . . . or compile and validate financial reports***. Key executive functions, including those of CFO, Chief Risk Officer, Global Controller and Chief Internal Auditor, were missing at some or all critical entities. Nor did the FTX Group have any dedicated financial risk, audit, or treasury departments." Policies and procedures "did not exist, were incomplete, or were highly generic and not appropriate for a firm handling substantial financial

---

4     The Bankruptcy Report defines "FTX Group" as "FTX Trading Ltd., West Realm Shires Services Inc., d/b/a FTX.US, Alameda Research LLC, and their directly and indirectly owned subsidiaries."

5     The term "Debtors" in the Bankruptcy Report refers to the FTX debtors and debtors-in-possession that were taken over by a new independent board that appointed Mr. Ray as new CEO in charge of sorting through the bankruptcy.

assets." There were also no ***"fundamental financial and accounting controls" and no "internal audit function whatsoever***."

141. FTX and Alameda did not even have an appropriate accounting system "capable of handling large volumes of data" that "[c]ompanies with operations as large and complex as those of the FTX Group normally employ":

> ***Fifty-six entities within the FTX Group did not produce financial statements of any kind. Thirty-five FTX Group entities used QuickBooks as their accounting system and relied on a hodgepodge of Google documents, Slack communications, shared drives, and Excel spreadsheets and other non-enterprise solutions to manage their assets and liabilities.***
>
> . . . because [FTX entities and Alameda] processed large volumes of data ***only manually***, a great deal of transaction detail (e.g., the purpose of a transaction) was either ***populated en masse, or omitted entirely***. ***Substantial accounts and positions went untracked*** in QuickBooks.  Digital asset transactions were tracked in QuickBooks using the generic entry 'investments in cryptocurrency,' but ***detailed recordkeeping reflecting what those cryptocurrency investments actually consisted of did not exist*** in QuickBooks, making reconciliation with other data sources extremely challenging or impossible.  ***Approximately 80,000 transactions were simply left as unprocessed*** accounting entries in catch-all QuickBooks accounts titled 'Ask My Accountant.'  Further complicating matters, QuickBooks entries were often made months after transactions occurred, rendering ***impossible real-time financial reporting and risk management***.

142. In an internal communication, Bankman-Fried described Alameda as "'hilariously beyond any threshold of any auditor being able to even get partially through an audit,'" adding:

> ***Alameda is unauditable***.  I don't mean this in the sense of 'a major accounting firm will have reservations about auditing it'; I mean this in the sense of '***we are only able to ballpark what its balances are***, let alone something like a comprehensive transaction history.'  ***We sometimes find $50m of assets lying around that we lost track of; such is life***.

143. The FTX entities and Alameda also had extraordinarily inadequate reporting and documentation:

> Key accounting reports necessary to understand the FTX Group's assets and liabilities, such as ***statements of cash flows, statements of equity, intercompany and related party transaction matrices, and schedules of customer entitlements, did not exist or were not prepared regularly***.  Important treasury reports, such as ***reports on daily liquidity, daily settlement, funding mismatches, concentration risk, and liability profiles, did not exist or were not prepared regularly***.  Copies of key documentation – including ***executed loan agreements, intercompany agreements, acquisition and investment documents, bank and brokerage account statements, and contract and account information of all types – were incomplete, inaccurate, contradictory, or missing entirely***.  Thousands of deposit checks were collected from the FTX Group's offices, some stale-dated for months, due to the failure of personnel to deposit checks in the ordinary course; instead, deposit checks collected like junk

mail.  As discussed in greater detail below, ***the FTX Group did not maintain reliable lists of bank or trading accounts, cryptocurrency wallets, or authorized signatories***. The Debtors have had to construct this historical data from scratch and make sense of the numerous resulting discrepancies, anomalies, and undocumented positions.

144.    In addition, transfers of funds were often approved through Slack, Signal and Telegram, instant messaging services that would utilize "'disappearing messages.'"  Often expenses and invoices were approved by "'emoji.'"  "These informal, ephemeral messaging systems were used to procure approvals for transfers in the tens of millions of dollars, leaving only informal records of such transfers, or no records at all."

145.    The Bankruptcy Report further stated that "the FTX Group maintained over a thousand accounts on external digital asset trading platforms in jurisdictions around the world, many of which held significant assets at various points in time, [but] it had ***no comprehensive, centralized source of information reflecting the purpose of these accounts, or the credentials to access them***."

146.    With respect to intercompany transactions, the Bankruptcy Report stated the following:

> ***The FTX Group did not observe any discernable corporate formalities when it came to intercompany transactions***.  Assets and liabilities were routinely shuffled among the FTX Group entities and insiders without proper process or documentation.  ***Alameda routinely provided funding for corporate expenditures (e.g., paying salaries and other business expenses) whether for Alameda, for various other Debtors, or for FTX DM, and for venture investments or acquisitions whether for Alameda or for various other Debtors.  Alameda also transferred funds to insiders to fund personal investments***, political contributions, and other expenditures – some of which were nominally 'papered' as personal loans with below-market interest rates and a balloon payment due years in the future.
>
> ***Intercompany and insider transfers were often recorded on the QuickBooks general ledgers in a manner that was inconsistent with the apparent purpose of the transfers***.  For example, an Alameda bank account transferred tens of millions of dollars to a personal bank account of Bankman-Fried in 2021 and 2022.  Although the transfers were documented in promissory notes as loans from Alameda to Bankman-Fried, they were recorded on the general ledger as 'Investment in Subsidiaries: Investments-Cryptocurrency.'  The Debtors have identified examples of intercompany transactions that do not balance to each other (i.e., where the amounts 'due to' and 'due from' do not balance across the relevant entities).  North Dimension, a shell company owned by Alameda, frequently recorded cash transfers to Alameda accounts in the general ledger with the description 'interco transfer reflecting bank wire,' without otherwise stating the purpose or substance of the transaction.

147.    Alameda was also granted extraordinary trading privileges by FTX, hardcoded in the trading software, to effectively give Alameda a limitless ability to trade and withdraw assets,

1   virtually regardless of the size of any negative balance (which was set at allowing a $65 billion

2   negative balance).  The Bankruptcy Report concluded that "*[a]ny number of different controls*

3   *routinely implemented by financial institutions and exchanges in established financial markets*

4   *would be expected to have prevented, detected, and escalated these secret privileges* to personnel in

5   control functions with sufficient independence and authority to address the issue."

6          148.    A fundamental responsibility of any exchange that holds customer assets is to

7   safeguard those assets.  FTX and Alameda did not have basic security controls to protect its crypto

8   assets.  The Bankruptcy Report concluded that "[e]ach failure was egregious in the context of a

9   business entrusted with customer transactions."  These failures included: keeping "*virtually all*

10  *crypto assets in hot wallets*," accounts connected to the internet with their private keys vulnerable to

11  cybersecurity threats; *no "system in place to monitor or move to cold wallets crypto assets* in excess

12  of the amount needed to cover two days of trading activity, and they did not use offline, air-gapped,

13  encrypted, and geographically distributed laptops to secure crypto assets;" and they *did not use*

14  *"unique keys or key fragments to effectuate a transaction*."  "*These controls are widely*

15  *understood to be crucial for crypto exchanges. . . . [T]here is no question that a crypto exchange*

16  *should employ multi-signature/MPC controls and cold storage solutions . . . neither the FTX*

17  *exchanges nor Alameda utilized them to protect crypto assets*."

18         149.    The Bankruptcy Report also highlighted multiple examples of FTX and Alameda's

19  inability to safeguard and manage private keys used by account holders to access crypto assets.  For

20  example, keys to over $100 million worth of crypto assets were stored in plain text without any

21  encryption at all.  Another key worth over $600 million was titled with four non-descriptive words

22  with no information about what the key was for or who it belonged to.  Other keys were simply titled

23  "use this" or "do not use" with no further context; or back up system, so if keys were lost "the

24  associated crypto assets would likely be permanently lost."  There were also instances where billions

25

26

27

28

1   of dollars of assets were stored on servers where employees could access, copy or unilaterally

2   transfer those assets without detection.[6]

3       150.   Mr. Ray concluded in the Bankruptcy Report that as of April 9, 2023, the new

4   controllers had recovered and placed into cold wallets over $1.4 billion in digital assets and

5   identified an additional $1.7 billion that they are in the process of recovering.

6       151.   With respect to other security issues concerning basic information technology, the

7   Bankruptcy Report confirmed that FTX and Alameda did not have "even the most widely accepted

8   controls relating to Identity and Access Management;" did not have "appropriate controls with

9   respect to cloud and infrastructure security – that is, controls to protect its cloud services, networks,

10  servers, and 'user endpoints' such as desktops and laptops;" and "did not implement controls

11  sufficient to protect sensitive data relating to its applications, including its application code, from

12  vulnerabilities and attacks."

13      152.   As detailed above, the total lack of controls and significant operational deficiencies

14  was blatant to anyone in the position of Defendants – as sophisticated investors and members of

15  FTX's Advisory Board would not have been able to deceive individuals to purchase, deposit, or

16  transact in fiat currency or digital assets on its exchange if it were not for Defendants' public

17  platforms, promotion, and active participation in the wrongful acts described herein.

18      153.   FTX and Alameda remain embroiled in bankruptcy proceedings, where their assets

19  continue to be consumed by a variety of costs.  Billions of dollars' worth of assets have yet to be

20  returned to customers, while each of the Defendants has escaped the collapse of FTX relatively

21  unscathed and continues to operate without any major disruptions to their respective investment

22  portfolios.

23  **Sequoia and Paradigm's Financial**
    **Gain from Commingled Assets**
24

25      154.   Sequoia and Paradigm were beneficiaries of the comingling of customer assets

26  between FTX and Alameda.  Recent bankruptcy filings show that Clifton Bay Investments LLC

_____

27  [6]   The Bankruptcy Report details an equally egregious lack of controls with respect to "wallet
    nodes" which are software programs that utilize private keys to effectuate transactions on the block
28  chain.

("Clifton Bay"), a Delaware entity controlled by Bankman-Fried for the purpose of managing "his" private investments, invested $50 million and committed to invest an additional $50 million in Sequoia Capital Fund, L.P., a fund managed and controlled by Sequoia.[7]  Similarly, Maclaurin Investments Ltd. ("Maclaurin"), a Seychelles entity owned by Alameda, invested $20.3 million and committed to invest another $14.7 million in Paradigm One (Cayman) Feeder LP, a fund managed and controlled by Paradigm.  Sequoia and Paradigm did not publicly reveal Clifton Bay or Alameda's stake in their funds.

155.   Sequoia and Paradigm both charge management fees and carried interest for their respective funds.  A typical fee structure for these types of funds are "2 and 20," or an annual 2% management fee and 20% of any profits (*i.e.*, carried interest).  Both Sequoia and Paradigm's management fees are based on the invested amount and the committed amount.  Thus under a typical structure, Sequoia Capital Fund, L.P. was due to collect at least $2 million in management fees annually and 20% of any profits from Clifton Bay's investment.  Paradigm was due to collect $700 thousand annually plus 20% of any profits from Maclaurin's investment.  This amount also does not include various pass through expenses and other fees that the funds charge investors periodically.

156.   When Sequoia and Paradigm received these respective investments, they undoubtedly performed due diligence on both Clifton Bay and Maclaurin as a matter of course.  The investment funds that Sequoia and Paradigm manage are "private funds," and are offered to investors pursuant to applicable exemptions from registration under the Securities Act of 1933 and the Securities Act of 1940.  In order to qualify for these exemptions, Sequoia and Paradigm would be required to investigate the beneficial owner of each investor as well as whether each investor is an accredited or qualified purchaser (*i.e.*, investors that meets certain financial and sophistication standards).  Thus, at minimum, Sequoia and Paradigm would have been required by law to ensure that it verified the beneficial owners and the applicable financial information of Clifton Bay and Maclaurin.

---

[7]   It has also been reported that Bankman-Fried invested an additional $100 million in Sequoia Capital Heritage Fund (SCHF Cayman, L.P.).

157.   In addition, investor commitments are contractual obligations by the investors in each fund and are formularized in subscription agreements.  As the SEC explains in its guidance about private funds:

> For example, if you structure your private fund as a limited partnership, a limited partnership agreement, or LPA, will document the fund's key legal terms and mechanics.  This may include how the general partner may call for capital commitments, how profits are split between the general partner and the limited partners, any management fees, and the extent to which limited partners may withdraw from the fund.

158.   Because each fund then makes investment decisions for deploying the promised capital, which requires a great amount upfront work (*e.g.*, detailed analysis, obtaining loans, company due diligence etc.), and the funds begin receiving fees based on the committed capital (*i.e.*, the capital it has not yet received), the funds have a strong business interest in knowing the source of the fee payments and committed capital and ensuring receipt of both will be certain.  As stated in a comment letter to the Financial Crimes Enforcement Network ("FinCEN") by the Managed Funds Association, an industry group that includes more than 160 member firms that collectively manage over $2 trillion:

> At the outset of the relationship with an investor, the administrator or RIA will conduct initial due diligence on the investor at the time of subscription. Industry practice takes into account whether the investor is sending its funds from an account in the investor's name at a financial institution that is located in a FATF-member jurisdiction and subject to customer identification procedures and AML requirements of that jurisdiction.  If the investment funds do not originate from financial institutions located in FATF-member jurisdictions, it is customary for enhanced due diligence to be performed.

> Investors are required to complete subscription documents, which include certain AML-related representations and warranties, including that the investor is not a senior political figure or a foreign shell bank, and that the investment funds are not derived directly or indirectly from illegal activities.  The investor is also subject to various screening procedures related to sanctions; negative news; and potential status as a senior foreign political figure.  Such screening is also generally conducted on the investor at the time of redemption.

159.   Further, Sequoia and Paradigm had obligations to conduct due diligence on their investors that stems from their own risk management and operational relationships with multiple financial institutions that must adhere to certain anti-money laundering ("AML") and know your customer ("KYC") laws and regulations, such as the Bank Secrecy Act, Patriot Act and Anti-Money Laundering Act.  For example, both Sequoia and Paradigm's funds have custody accounts with J.P.

Morgan who states that its AML program includes: "Know Your Customer standards including a Customer Identification Program and Customer Due Diligence procedures reasonably designed to identify and verify all customers and, where applicable, beneficial owners, source of funds, and the nature and intended purpose of the business relationship, to the extent warranted by the risk of money laundering or terrorist financing or as required by regulation."[8]  Both Sequoia and Paradigm also use other financial institutions, such as Merrill Lynch and Northern Trust, which have similar legal requirements and compliance programs.  Indeed, the Managed Funds Association states "the vast majority of its RIA members have had AML programs in place for a number of years."

160.    Because of these various obligations and basic business practices, Sequoia and Paradigm actually or constructively knew, or were reckless in not knowing, that FTX, Alameda, Clifton Bay, and Maclaurin were comingling customer assets and improperly using FTX customer funds.  For example, Clifton Bay's September 30, 2022 balance sheet showed $1,519,326 in total liabilities consisting of $1,519,283 in accounts payable to the related FTX and Alameda entities.  On the asset side, Clifton Bay showed $1,520,111 in total assets, only $785 more than its liabilities. And of its assets, $1,492,856 were investments with only $27,255 classified as other types of assets. In other words, the source of Clifton Bay's investments could only be from FTX and Alameda entities because the only asset entries to offset money owed to these entities are the investments, including Clifton Bay's investment in the Sequoia funds.

161.    With respect to McLaurin, Paradigm would have also performed the necessary due diligence on both FTX, as an investment for its funds, and Alameda, the owner of McLaurin, for the reasons stated above.  Even a perfunctory review would show the comingling of customer funds and the massive deficiencies as reported in the Bankruptcy Report.  Moreover, because McLaurin is also a Seychelles entity, an even higher level of scrutiny would have been given to comply with both AML and KYC.

---

[8]    J.P. Morgan Chase Bank has also entered into a consent order with the Office of the Comptroller of Currency requiring it to take additional BSA/AML steps. [https://www.occ.gov/news-issuances /news-releases/2013/nr-occ-2013-8a.pdf].

162.    On January 10, 2023, the *Financial Times* confirmed that one of the investors in the Paradigm One fund was FTX's sister trading company, Alameda, and questioned the "circular" nature of these transactions.  The article quoted Charles Whitehead, a professor at Cornell Law School, who described the investments as "'weird . . . it raises your eyebrows.'"  What was weird then is now understood.  These circular investments allowed Sequoia and Paradigm to profit from the comingling of customer assets between FTX, Alameda and Bankman-Fried's other entities.  Sequoia and Paradigm invested capital to keep FTX and Alameda afloat, while also being a beneficiary of capital from the customer accounts of these entities.  Sequoia and Paradigm reaped significant management fees, and a share of any profits from these investments by FTX and Alameda.

## CLASS ACTION ALLEGATIONS

163.    Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3) on behalf of a Class consisting of all persons and entities that purchased, deposited, and/or transacted in fiat currency or digital assets in accounts with FTX during the Class Period and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, FTX, Alameda, Clifton Bay, Bankman-Fried, Ellison, Singh, Wang, and any of their officers and directors, at all relevant times, members of their immediate families, and their legal representatives, heirs, successors, or assigns, and any entity in which they have or had a controlling interest.

164.    The members of the Class are so numerous that joinder of all members is impracticable.  Plaintiffs and members of the Class are presently unable to withdraw their assets from FTX accounts.  While Plaintiffs, at this time, does not possess information on the exact number of Class members, and the number of such persons may only be ascertained through appropriate discovery, Plaintiffs believe that there are more than one million members in the proposed Class. For example, the FTX website currently posts a prepared statement for the May 12, 2022 testimony Bankman-Fried provided to the U.S. House Committee on Agriculture, in which it is stated:  "At the time of this writing, the FTX platforms have millions of registered users, and the FTX US platform has around one million users."  Class members may be identified from records maintained by FTX

1  or their transfer agents and may be notified of the pendency of this action by mail, using the form of

2  notice similar to that customarily used in class actions.  Alternatively, since one or more of the FTX

3  entities required customers to consent to receive communications electronically and to provide them

4  with the customers' email addresses, email notice to Class members may also be a suitable

5  alternative to mail notice in this action.

6       165.    Plaintiffs' claims are typical of the claims of the members of the Class as all members

7  of the Class are similarly affected by Defendants' wrongful conduct in violation of laws that are

8  complained of herein.

9       166.    Plaintiffs will fairly and adequately protect the interests of the members of the Class

10 and have retained counsel competent and experienced in complex class action litigation.  Plaintiffs

11 have no interests antagonistic to or in conflict with those of the Class.

12      167.    Common questions of law and fact exist as to all members of the Class and

13 predominate over any questions solely affecting individual members of the Class.  Among the

14 questions of law and fact common to the Class are:

15           (a)     whether Defendants violated Cal. Bus. & Prof. Code §§17200, *et seq*. and

16 17500, *et seq*.;

17           (b)     whether Defendants violated Cal. Corp. Code §25504.1;

18           (c)     whether Defendants violated the common law as alleged herein;

19           (d)     whether Defendants engaged in a conspiracy as alleged herein;

20           (e)     whether Defendants aided and abetted the violations of law of each of the

21 other Defendants and/or FTX and their affiliates as alleged herein;

22           (f)     whether Plaintiffs and Class members are entitled to compensatory damages,

23 restitution, punitive damages, statutory damages, declaratory relief, disgorgement, and/or other legal

24 or equitable remedies as a result of Defendants' conduct; and

25           (g)     the extent of damage sustained by Class members.

26      168.    A class action is superior to all other available methods for the fair and efficient

27 adjudication of this controversy since joining all Class members is impracticable, and this action will

28 be manageable as a class action.

**COUNT I**

**Violation of California's Unfair Competition Law
(Cal. Bus. & Prof. Code §17200, *et seq.*)**

169.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

170.   This Count is asserted against Defendants and is based upon the California Unfair Competition Law ("UCL"), which prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code §17200.

171.   Defendants' unfair and deceptive practices described herein were likely to mislead – and in fact did mislead – consumers acting reasonably in the circumstances into purchasing, depositing, and/or transacting in fiat currency and digital assets with accounts with FTX.

172.   **Unlawful**: During the Class Period, Defendants advertised and otherwise promoted FTX using false and/or misleading claims, such that Defendants' actions as alleged herein violate at least the following laws:

(a)   The False Advertising Law, Cal. Bus. & Prof. Code §17500, *et seq.*; and

(b)   Cal. Corp. Code §25504.1.

173.   **Fraudulent**: A practice is "fraudulent" under the UCL if members of the general public were or are likely to be deceived. As detailed herein, Defendants' statements regarding, *inter alia*, the safety and viability of FTX and their own due diligence activities were deceptive to the public.

174.   **Unfair**: The UCL gives courts maximum discretion to address improper business practices that are "unfair." Defendants' collective conduct with respect to the marketing and promotion of FTX is unfair because Defendants' conduct was immoral, unethical, unscrupulous, or substantially injurious to consumers in inducing them to purchase, transact, and/or deposit fiat currency and digital assets with accounts with FTX and the utility of Defendants' conduct, if any, does not remotely outweigh the gravity of the harm to their victims. Plaintiffs and the Class would not have purchased, transacted, and/or deposited fiat currency and digital assets with accounts with

1   FTX at the prices paid or at all had they known that the statements were misrepresentations and

2   deceptive.

3         175.   Defendants' conduct with respect to the promotion of FTX is also unfair because the

4   consumer injury is substantial, not outweighed by benefits to consumers or competition, and not one

5   that consumers can reasonably avoid.

6         176.   The harm suffered by Plaintiffs and the Class was directly and proximately caused by

7   the deceptive and unfair practices of Defendants related to the promotion and marketing of FTX, as

8   described herein.

9         177.   In accordance with Cal. Bus. & Prof. Code §17203, Plaintiffs seek an order enjoining

10   the Defendants from continuing to conduct business through fraudulent or unlawful acts and

11   practices and to commence a corrective advertising campaign.  On behalf of the Class, Plaintiffs also

12   seek an order for the restitution of all monies made from Defendants' investments in or other

13   business dealings with FTX, which were made resulting from acts of fraudulent, unfair, or unlawful

14   competition as detailed herein.

15   **COUNT II**

16   **Violation of California's False Advertising Law**<br>**(Cal. Bus. & Prof. Code §17500, *et seq.*)**

17

18         178.   Plaintiffs repeat and reallege each and every allegation contained in the foregoing

19   paragraphs as if fully set forth herein.

20         179.   This Count is asserted against Defendants and is based upon California's False

21   Advertising Law, which prohibits any statement in connection with the sale of goods or services

22   "which is untrue or misleading."  Cal. Bus. & Prof. Code §17500.

23         180.   As set forth herein, Defendants made statements regarding FTX and their own due

24   diligence activities that were untrue or misleading.  They publicly represented, *inter alia*, that FTX

25   was a viable and safe way to invest in crypto and that they had vetted these representations through

26   their own due diligence efforts, statements designed to deceive consumers into investing with FTX.

27         181.   Defendants' claims that FTX was, *inter alia*, viable and safe for investing in crypto

28   and that they had verified these representations through robust due diligence activities were untrue

and manifestly false and misleading for the reasons detailed herein.  For example, when FTX imploded in late 2022, it was revealed that FTX had failed to employ the most basic safeguards and siphoned billions of dollars' worth of customer assets for their own nefarious purposes during the Class Period.

182.    Defendants knew, or reasonably should have known, that their claims relating to, *inter alia*, the viability and safety of FTX and their own due diligence activities were untrue or misleading.  Defendants failed to adequately inform Plaintiffs and the Class of the true nature of FTX.

183.    When the true nature of FTX became publicly known at the end of the Class Period, the immediate public outrage, bankruptcy proceedings, and government investigation reflected the degree to which consumers and the public at large felt they were deceived by Defendants and FTX's business practices.

184.    By reason of the above conduct, Defendants are liable pursuant to Cal. Bus. & Prof. Code §17500.

## COUNT III

### Violation of Cal. Corp. Code §25504.1

185.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

186.    Cal. Corp. Code §25504.1 imposes joint and several liability for "[a]ny person who materially assists in any violation of Section 25110 . . . or 25401 . . . with intent to deceive or defraud."

187.    "Materially assisting" in an alleged securities law violation, as defined under California law, may take the form of communicating misrepresentations directly to investors, or otherwise playing a material, facilitating role in the alleged securities law violation.

188.    As alleged herein, Defendants made material misrepresentations and omissions to Plaintiffs and Class members regarding, *inter alia*, the viability and safety of FTX and their own due diligence activities with the intent to deceive and/or defraud investors in order to induce them to

1   open accounts and purchase, transact in, and/or deposit securities on the FTX platforms, including

2   securities such as yield-bearing accounts ("YBAs") that were issued by FTX.

3      189. The YBAs constituted unregistered securities sold in violation of Cal. Corp. Code

4   §25110.  FTX, with Defendants' material assistance, offered and sold the unregistered YBAs to

5   members of the Class.

6      190. In addition, Cal. Corp. Code §25401 makes it "unlawful for any person to offer or sell

7   a security in this state, or to buy or offer to buy a security in this state, by means of any written or

8   oral communication that includes an untrue statement of a material fact or omits to state a material

9   fact necessary to make the statements made, in the light of the circumstances under which the

10  statements were made, not misleading."  FTX, together with the material assistance of Defendants,

11  sold the YBAs by means of materially false and misleading written and oral communications.

12     191. As a result of this assistance, Defendants violated Cal. Corp. Code §25504.1 and

13  Plaintiffs and members of the Class sustained damages as herein described.

14  **COUNT IV**

15  **Negligent Misrepresentation**

16     192. Plaintiffs repeat and reallege each and every allegation contained in the foregoing

17  paragraphs as if fully set forth herein.

18     193. Plaintiffs bring this claim against Defendants for negligent misrepresentation.

19     194. As detailed herein, Defendants negligently misrepresented certain material facts,

20  including, *inter alia*, regarding the safety and viability of FTX and their own due diligence activities

21  in order to induce confidence in the FTX platforms and convince consumers to commit fiat currency

22  and digital assets to the FTX platforms, thereby increasing the value of Defendants' investments in

23  FTX.

24     195. Defendants made these material misrepresentations without reasonable grounds for

25  believing the misrepresented facts to be true.

26     196. The representations made by Defendants in connection with FTX were material and

27  would have been considered by a reasonable consumer in making decisions to engage in any

28  transactions with FTX.

197.    Plaintiffs and the Class justifiably relied on Defendants' statements in that they purchased, deposited, and/or transacted in fiat currency and digital assets with accounts with FTX, which they would not have done at the prices paid or at all had they known the true nature of the FTX platforms.  Plaintiffs and the members of the Class opened accounts and purchased, transacted, and/or deposited fiat currency and digital assets into accounts with the FTX entities believing that the FTX platforms would be operated in accordance with the representations made by Defendants.

198.    As a result, Plaintiffs and members of the Class were directly and proximately injured by Defendants' negligence in failing to inform Plaintiffs and members of the Class of the true nature of the operations of the FTX platforms.

199.    As a result of Defendants' negligent misrepresentation during the Class Period, Plaintiffs and the Class suffered damages, including because they cannot retrieve their fiat currency or digital assets currently in accounts with the FTX platforms as a result of the insolvency of FTX.

**COUNT V**

**Intentional Misrepresentation**

200.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

201.    Plaintiffs bring this claim against Defendants for intentional misrepresentation.

202.    As detailed herein, Defendants knowingly misrepresented certain material facts, including, *inter alia*, regarding the safety and viability of FTX and their own due diligence activities in order to induce confidence in the FTX platforms and convince consumers to commit fiat currency and digital assets to the FTX platforms, thereby increasing the value of Defendants' investments in FTX.

203.    Defendants made these misrepresentations with knowledge that their statements were materially misleading.

204.    The representations made by Defendants in connection with FTX were material and would have been considered by a reasonable consumer in making decisions to engage in any transactions with FTX.

205.     Plaintiffs and the Class actually and justifiably relied on Defendants' statements in that they purchased, deposited, and/or transacted in fiat currency and digital assets with accounts with FTX, which they would not have done at the prices paid or at all had they known the true nature of the FTX platforms.  Plaintiffs and the members of the Class opened accounts and purchased, transacted, and/or deposited fiat currency and digital assets into accounts with the FTX entities believing that the FTX platforms would be operated in accordance with the representations made by Defendants.

206.     As a result, Plaintiffs and members of the Class were directly and proximately injured by Defendants' intentional misrepresentations in failing to inform Plaintiffs and members of the Class of the true nature of the operations of the FTX platforms.

207.     As a result of Defendants' intentional misrepresentations during the Class Period, Plaintiffs and the Class suffered damages, including because they cannot retrieve their fiat currency or digital assets currently in accounts with the FTX platforms as a result of the insolvency of FTX.

## COUNT VI

### Fraudulent Inducement

208.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

209.     This Count is asserted against Defendants and is based upon the claim of fraudulent inducement.

210.     As detailed herein, Defendants materially misrepresented and omitted existing facts about the FTX entities when they failed to disclose information regarding the true nature of FTX and their own due diligence efforts that was known to them.

211.     The omission is material because Plaintiffs and the Class would not have transacted with FTX had they known the true nature of FTX.

212.     Defendants marketed and promoted FTX to Plaintiffs and the Class despite having knowledge of the true nature of FTX that were contrary to their public misrepresentations.

213.     Defendants intended that consumers and purchasers would rely on Defendants' statements regarding, *inter alia*, the safety and viability of FTX and their own due diligence

1    activities so as to increase the user base for FTX and thereby increase the value of their investments

2    in FTX.

3        214.    Plaintiffs and the Class were not aware of the true nature and safety of FTX's

4    platform and could not reasonably have discovered those true characteristics.

5        215.    Plaintiffs and the Class justifiably relied on Defendants' statements in that they

6    purchased, deposited, and/or transacted in fiat currency and digital assets with accounts with FTX,

7    which they would not have done at the prices paid or at all had they known the true nature of the

8    FTX platforms.

9        216.    As a result of Defendants' fraudulent inducement of Plaintiffs and the Class onto the

10    FTX platforms, Plaintiffs and the Class suffered damages, including because they cannot retrieve

11    their fiat currency or digital assets currently in accounts with the FTX platforms as a result of the

12    insolvency of FTX.

13                        **COUNT VII**

14                       **Civil Conspiracy**

15        217.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing

16    paragraphs as if fully set forth herein.

17        218.    This Count is asserted against Defendants and is based upon the claim of civil

18    conspiracy under common law.

19        219.    Defendants made misrepresentations and omissions to Plaintiffs and Class members

20    regarding, *inter alia*, the viability and safety of FTX and their own due diligence activities in order to

21    induce confidence in the FTX platforms and convince consumers to commit fiat currency and digital

22    assets to the FTX platforms, thereby increasing the value of Defendants' investments in FTX.

23        220.    As detailed herein, Defendants engaged in concerted tortious acts, particularly in the

24    form of misrepresentations and omissions made to Plaintiffs and the Class for the purposes of

25    inducing them to commit fiat currency and digital assets to the FTX platforms, thereby increasing

26    the value of Defendants' investments in FTX. These acts were made in concert and pursuant to an

27    agreement among FTX, Bankman-Fried, and Defendants to promote the FTX platforms.

28

221.     In addition to benefitting Defendants by increasing the value of their investments in FTX, the conspiracy substantially aided the wrongdoing conducted by FTX and Bankman-Fried.

222.     As a result of Defendants' civil conspiracy, Plaintiffs and the Class suffered damages, including because they cannot retrieve their fiat currency or digital assets currently in accounts with the FTX platforms as a result of the insolvency of FTX.

**COUNT VIII**

**Aiding and Abetting**

223.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

224.     This Count is asserted against Defendants for aiding and abetting the violations of law undertaken by each other and FTX and their affiliates as alleged herein.

225.     Defendants made misrepresentations and omissions to Plaintiffs and Class members regarding, *inter alia*, the viability and safety of FTX and their own due diligence activities in order to induce confidence in the FTX platforms and convince consumers to commit fiat currency and digital assets to the FTX platforms, thereby increasing the value of Defendants' investments in FTX.  As a result, Defendants provided substantial assistance to FTX in connection with the tortious activities alleged herein.

226.     Defendants had knowledge of the wrongdoing by FTX as a result of their experience and relationship with FTX, including through the due diligence that each provided in connection with their substantial investments in FTX.

227.     As a result of Defendants' aiding and abetting of the violations of law by each other and FTX and their affiliates as detailed herein, Plaintiffs and the Class suffered damages, including because they cannot retrieve their fiat currency or digital assets currently in accounts with the FTX platforms as a result of the insolvency of FTX.

**COUNT IX**

**Declaratory Judgment
(Cal. Civ. Proc. Code §1060)**

228.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

229.     This Count is asserted against Defendants and is based upon the violations of the UCL and the California Unfair Advertising Law as alleged herein.

230.     There is a bona fide, actual, and present need for the declaratory relief requested herein; the declaratory relief prayed for herein deals with a present, ascertained, or ascertainable state of facts and a present controversy as to the state of facts; contractual and statutory duties and rights are dependent on those facts and law applicable to the facts; the parties have an actual, present, adverse, and directly antagonistic interest in the subject matter; and the antagonistic and adverse interests are all before this Court by proper process for final resolution.

231.     Plaintiffs and the Class have an obvious and significant interest in the outcome of this lawsuit.

232.     Plaintiffs and the Class purchased, transacted, and/or deposited fiat currency and digital assets with accounts with FTX in reliance on Defendants' false and misleading statements.

233.     If Plaintiffs and the Class knew the true facts surrounding FTX, Plaintiffs and the Class would not have purchased, transacted, or deposited fiat currency and digital assets with FTX at the prices paid or at all.

234.     Thus, there is a justiciable controversy over whether the Defendants illegally solicited their purchases, deposits, and other transactions from Plaintiffs and the Class.

235.     Plaintiffs and the Class seek an order declaring that Defendants committed the violations of law alleged herein; enjoining Defendants from continuing such legal violations; ordering that Defendants engage in appropriate and equitable remedial measures, such as issuing public announcements to correct their misrepresentations of material fact regarding FTX and their own due diligence activities; and ordering that each of the Defendants that received financial

1  benefits from their wrongful acts detailed herein provide appropriate and equitable restitution to

2  Plaintiffs and members of the Class.

3                                   **PRAYER FOR RELIEF**

4            WHEREFORE, Plaintiffs pray for judgment as follows:

5            A.      Determining that this action is a proper class action, certifying Plaintiffs as Class

6  representatives under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiffs'

7  counsel as Class counsel;

8            B.      Awarding compensatory damages in favor of Plaintiffs and the other Class members

9  against all Defendants, jointly and severally, for all damages sustained as a result of Defendants'

10 wrongdoing, in an amount to be proven at trial, including interest thereon;

11           C.      Awarding rescission or a rescissory measure of damages;

12           D.      Disgorgement of Defendants' ill-gotten gains;

13           E.      Providing the declaratory relief requested;

14           F.      Awarding punitive damages, including, but not limited to, under Cal. Civ. Code

15 §3294;

16           G.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this

17 action, including counsel fees and expert fees;

18           H.      Awarding pre- and post-judgement interest, including, but not limited to, under Cal.

19 Civ. Code §3287, *et seq*. and Cal. Civ. Proc. Code §680.010, *et seq*.; and

20           I.      Awarding such other and further relief as the Court may deem just and proper.

21                                      **JURY DEMAND**

22           Plaintiffs demand a trial by jury.

23 DATED:  May 23, 2023                        ROBBINS GELLER RUDMAN
                                                 & DOWD LLP
24                                              ERIC I. NIEHAUS
                                                BRIAN E. COCHRAN
25                                              PATTON L. JOHNSON
                                                KENNETH P. DOLITSKY
26

27                                                      s/ Eric I. Niehaus
28                                              ERIC I. NIEHAUS

1

2     655 West Broadway, Suite 1900
      San Diego, CA  92101
3     Telephone:  619/231-1058
      619/231-7423 (fax)

4     ROBBINS GELLER RUDMAN
         & DOWD LLP
5     SHAWN A. WILLIAMS
      HADIYA K. DESHMUKH
6     Post Montgomery Center
      One Montgomery Street, Suite 1800
7     San Francisco, CA  94104
      Telephone:  415/288-4545
8     415/288-4534 (fax)

9     ROBBINS GELLER RUDMAN
         & DOWD LLP
10    STUART A. DAVIDSON (admitted *pro hac vice*)
      ANNY M. MARTIN (admitted *pro hac vice*)
11    225 NE Mizner Boulevard, Suite 720
      Boca Raton, FL 33432
12    Telephone:  561/750-3000
      561/750-3364 (fax)

13    Attorneys for Plaintiffs and Interim Class Counsel

14

15    HERMAN JONES LLP
      John C. Herman (Ga. Bar No. 348370)
16    Candace Smith (Ga. Bar No. 654910)
      3424 Peachtree Road, N.E., Suite 1650
17    Atlanta, Georgia 30326
      Telephone: 404/504-6500
18    404/504-6501 (fax)
      jherman@hermanjones.com
19    csmith@hermanjones.com

20    Additional Attorneys for Plaintiffs

21

22

23

24

25

26

27

28

1

<u>CERTIFICATE OF SERVICE</u>

2

       I hereby certify under penalty of perjury that on May 23, 2023, I authorized the electronic

3 filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send

4 notification of such filing to the email addresses on the attached Electronic Mail Notice List, and I

5 hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the

6 non-CM/ECF participants indicated on the attached Manual Notice List.

7

                                  s/ Eric I. Niehaus

8

                                   ERIC I. NIEHAUS

9

                                   ROBBINS GELLER RUDMAN
                                     & DOWD LLP

10

                                   655 West Broadway, Suite 1900
                                   San Diego, CA  92101-8498

11

                                   Telephone:  619/231-1058
                                   619/231-7423 (fax)

12

                                   Email:  ericn@rgrdlaw.com

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4885-5758-2693.v1

## Mailing Information for a Case 3:23-cv-00655-JSC Rabbitte v. Sequoia Capital Operations, LLC et al

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Ye Eun Chun**
  chchun@cgsh.com

- **Brian Edward Cochran**
  BCochran@rgrdlaw.com,e_file_sd@rgrdlaw.com,wgravitt@rgrdlaw.com

- **Stuart Andrew Davidson**
  sdavidson@rgrdlaw.com,jdennis@rgrdlaw.com,sdavidson@ecf.courtdrive.com,ppuerto@rgrdlaw.com,e_file_sd@rgrdlaw.com,amartin@rgrdlaw.com,creynolds@rgrdl

- **Hadiya Khan Deshmukh**
  hdeshmukh@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Kenneth P. Dolitsky**
  kdolitsky@rgrdlaw.com

- **Alexander C. Drylewski**
  alexander.drylewski@skadden.com

- **Mark R.S. Foster**
  mark.foster@skadden.com,mark-rs-foster-7528@ecf.pacerpro.com,thernandez@mofo.com

- **Patton L. Johnson**
  pjohnson@rgrdlaw.com,PJohnson2019@ecf.courtdrive.com,tdevries@rgrdlaw.com

- **Anny Marie Martin**
  amartin@rgrdlaw.com

- **Mark Edward McKane**
  mark.mckane@kirkland.com,kat.nguyen@kirkland.com,adrienne-levin-5018@ecf.pacerpro.com

- **Eric Ian Niehaus**
  ericn@rgrdlaw.com,WGravitt@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Jennifer Kennedy Park**
  jkpark@cgsh.com,maofiling@cgsh.com

- **Stephen M. Silva**
  stephen.silva@kirkland.com

- **Anna Terteryan**
  anna.terteryan@kirkland.com,jessie.james@kirkland.com,sarah.farley@kirkland.com

- **Joshua Walden**
  jwalden@cgsh.com

- **Shawn A. Williams**
  shawnw@rgrdlaw.com,ShawnW@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)